**CITY OF LOUISVILLE, a municipal corporation, Appellant,**

v.

**LOUISVILLE SEED COMPANY, Appellee.**

Court of Appeals of Kentucky.

March 8, 1968.

Rehearing Denied Dec. 6, 1968.

Bernard S. Goldstein, Chester A. Vittitow, Jr., Asst. Directors of Law, Louisville, Eugene H. Alvey, Director of Law, Louisville, for appellant.

Joseph E. Stopher, A. J. Deindoerfer, William P. Swain, Boehl, Stopher, Graves & Deindoerfer, Henry J. Stites, Stites & Stites, Louisville, for appellee.

OSBORNE, Judge.

This is a suit by the appellee, Louisville Seed Company, against the City of Louisville for damages. It grows out of the city's negligence in its failure to install gates in the municipal flood wall system during the flood of March, 1964. The action was tried before a jury and judgment entered upon its verdict in the amount of $81,771.43. The appeal before us is upon this judgment.

■ The city claims many errors in the trial. It first contends that appellee was contributorily negligent. This contention is based upon the theory that appellee should not have relied upon the assurances given by the mayor and other city officials including the flood control department that the gates would be installed in time to protect the citizens from flood damages. It is their contention that appellee knew or should have known the gates were not in place. The long-established rule of this jurisdiction is that contributory negligence is ordinarily a question for the jury especially where reasonable minds might differ. We believe such was the case here. See Winn-Dixie Louisville, Inc. v. Smith, Ky., 372 S.W.2d 789.

■ Appellant contends that adverse publicity during the course of the trial was prejudicial to its right to a fair trial and for that reason the judgment should be reversed. In support of this contention they direct the court's attention to various headlines appearing in a local newspaper and cite Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600. The trial judge admonished the jury not to read the newspapers during the course of the trial and there being nothing in the record to indicate that the jurors did not heed this admonition, we have no alternative but to conclude that they complied with the directions of the court. In any event, we hardly think the Sheppard case analogous as it deals with a criminal prosecution which must of necessity be and has historically been protected by more stringent rules against prejudicial publicity than have civil cases. It is difficult to imagine how a case of such local importance as this one was could be heard without attending publicity. In th absence of a showing that the publicity had an effect upon the outcome of the trial it cannot be declared that the excessive publicity rendered the trial invalid.

■ There is a contention that the verdict was excessive on two grounds. First, that it is for the exact amount asked for in the complaint and, secondly, that the jury awarded damages for lost profits. As to these two contentions, we believe the first faulty in that there was evidence to support the amount of the verdict and for this reason it is not material that it is for the full amount asked. As to the second contention, appellant did not object when evidence supporting the loss of profits was introduced nor did it object to the court's instructions allowing loss of profits. Where errors are not properly preserved they cannot be raised for the first time before this court.

Appellant's next contention is the main thrust of its defense. It contends that this court was in error in striking down the doctrine of sovereign immunity as applied to municipalities. Haney v. City of Lexington, Ky., 386 S.W.2d 738, and City of Louisville v. Chapman, Ky., 413 S.W.2d 74. It is its contention that these cases were ill considered and the ramifications of the abolition of the doctrine of sovereign immunity can be devastating upon the affairs of the city. For this reason it argues these cases should be overruled and the doctrine reinstated.

It is difficult to perceive how the cause of justice can be advanced by turning back the pages of history. The history of the doctrine of sovereign immunity, as it relates to municipalities, from its inception in 1788 in the English case of Russell v. Men of Devon, 2 Term Rep. 667, 100 Eng. Rep. 359, to its demise in this jurisdiction in 1964 in the Haney case, supra, was never satisfactory. Many jurisdictions as did ours made exceptions to the rule for activities classified as proprietary. The distinction between proprietary and governmental was never very clear and led to much confusion.[1]

1. This distinction was not made as to the ultimate function, but covered all activities in the carrying out of governmental functions. Therefore, if a city truck, engaged in a governmental function, was involved in an accident, no recovery could be had, however, if the truck was involved in a proprietary function recovery

Other jurisdictions made an exception in those cases where the tort could be classified as a nuisance. Phillips v. City of Pasadena, 27 Cal. 104, 162 P.2d 625. Because of conflicting opinions engendered by the doctrine and because of what was felt to be social injustice occasioned by its application it has been berated by innumerable courts and legal writers alike. In 1957, the Supreme Court of Florida in Hargrove v. Town of Cocoa Beach, Fla., 96 So.2d 130, 60 A.L.R.2d 1193, struck the doctrine down. This was immediately followed by several other jurisdictions including our own until now, eleven years later, many jurisdictions by virtue of legislation or judicial decree no longer follow the doctrine. This move is viewed by those who sponsored its demise as progressive enlightenment and by others as a serious mistake. It will have to be left to the future to judge who is correct.

Now that the protection of immunity is breached the time is upon us to determine in what instances and to what extent actions should be permitted against our municipalities. It is immediately recognized that there must be some limitations. Public agencies engage in activities of a scope and variety far beyond that of any private business. These activities affect a much larger segment of the public than do the activities of private business. Private business carries on no activities even remotely comparable to a city street system which may cover many thousands of miles and is used by the entire public. With rare exceptions, private business carries on no function as hazardous or exacting in detail as the work of a city fire or police department. These activities are so inherently dangerous that private business would hesitate to undertake them. In addition, our cities and other sovereign governments must care for mental patients, keep jails, juvenile and other detention services, control the spread of communicable disease, maintain sewer and flood facilities, and more recently, provide for control of riots.[2] All of these are so important to the health, safety and welfare of the public that they cannot properly be abandoned. And, it can be readily appreciated that the imposition of broad standards of tort liability upon them might be extremely burdensome and could possibly force their curtailment or even abandonment to the detriment of the general public. For this reason, some reasonable compromise must be reached—one that will permit the isolated citizen to recover for grievous injustices imposed upon him by a negligent society, yet protect that society from what could cumulate into ruinous claims. One of the leading cases in which a court faced this problem is Steitz v. City of Beacon, 295 N.Y. 51, 64 N.E.2d 704. Here a city was sued by one whose property had been destroyed by fire as a result of the negligence of the city in failing to maintain its fire fighting equipment. Sovereign immunity had been previously waived by legislative action. The court, in construing an act which required the city to maintain the equipment, held it could not be so construed as to impose a "crushing burden" upon the city. The opinion states:

"Quite obviously these provisions were not in terms designed to protect the personal interest of any individual and clearly were designed to secure the benefits of well ordered municipal government enjoyed by all as members of the community.[3] There was indeed a public duty to maintain a fire department, but that was all, and there was no suggestion that for any omission in keeping hydrants, valves or pipes in repair the people of

was allowed. Therefore, recovery did not depend on the peculiarities of the situation or of the risk, and recovery for the same negligence by the city would be sometimes allowed and sometimes denied.

2. See Municipal Liability For Riot Damage, 81 Harvard Law Review 653. Also,

Some Problems of a Sovereign Without Immunity, 36 Southern California Law Review 161.

3. Here the court is referring to ordinances setting up a fire department.

the city could recover fire damages to their property.

"An intention to impose upon the city the crushing burden of such an obligation should not be imputed to the Legislature in the absence of language clearly designed to have that effect."

Another case in which this problem was faced is Steinhardt v. Town of North Bay Village, Fla.App., 132 So.2d 764. This case, like the previous one, was an action for failure to extinguish a fire. Sovereign immunity had previously been abolished. The court pointed out that conflagrations might reach such proportions as to exceed the ability of the city to respond in damages. Therefore, liability should be denied. Pertinent parts of the opinion read as follows:

"In a consideration of the problem, we are not greatly aided by the many cases from other jurisdictions, which almost uniformly hold that a city is not liable. The greatest number of the cases cited base the holding upon the conclusion that the maintenance and operation of a municipal fire department are a governmental function, and in the excercise of such function, the municipality is immune to liability. The distinction between proprietary and governmental functions is no longer valid as a method of allocating municipal liability in this state. It is sometimes said that failure to provide adequate fire protection involves the denial of a benefit owing to the community as a whole, but that it does not constitute a wrong or injury to a member thereof so as to give rise to a right of individual redress. Notwithstanding such reasoning, our Supreme Court in Mugge v. Tampa Waterworks Co., 52 Fla. 371, 42 So. 81, 6 L.R.A.,N.S., 1171, held that where a private water company fails to furnish an adequate water supply pursuant to its contract with the city, and an individual suffers fire damage because of this failure, the individual has a right of action against the company even though the benefit of the contract runs to the community as a whole.

"If we look for reasons rather than reasoning in the cases denying municipal liability for loss occasioned by the failure to extinguish fires, we will find reasons enough. The most influential of these is the thought that a conflagration might cause losses, the payment of which would bankrupt the community. Closely allied with this fear is the realization that the crushing burden of extensive losses can better be distributed through the medium of private insurance."

By way of supporting argument in conjunction with the fear of crippling fiscal consequences, some writers contend that the governmental unit should not be held liable where the activities involved are voluntarily undertaken by the government and do not arise out of a legal duty. This argument suggests that catastrophic liabilities from many suits might dissuade the public officials from engaging in beneficial functions to the general detriment of the public. Alstyne, Governmental Tort Liability: A Public Policy Prospectus, 10 U.C.L.A.L. Rev., 463, 505 (1963). We are persuaded that a desirable approach to the problem would seek to identify possible legal criteria intermediate between the extremes of immunity and liability which will serve the interest of justice to the injured and the total community alike without unduly hindering the government in fulfilling its appointed task. In doing this, we must examine the very roots of tort liability. Here we find that its purpose is to compensate the injured, to spread the loss and to deter others from committing like wrongs. When these rules are applied to controversies between the individual citizen and governmental units, they often take on meanings which they do not have when applied between citizen and citizen. When we consider deterrents, we find that often the official who is guilty of the wrong doing does not personally bear the loss. Therefore, the deterrent factor is not so

forceful in actions against governmental units. Also, there are many situations in which the incentive for the practice of safety by governmental officials is inherent in the activity itself. As an example, if the officials of a city should determine to abolish its fire department it could hardly be said that the hazard they would risk from possible suits by individual property owners would be anywhere equal in importance to the hazard they would face at the hands of the polity. Likewise, under certain circumstances, the loss spreading factor loses a great deal of its significance. Where the occasions of loss are sparse and the amount is not too large, they may be spread among the taxpayers. However, there could well be a loss so great in size that it would completely destroy the financial posture of a small municipality. By the same token, there may be losses so great in numbers and size that they could consume the entire financial resources of even the largest municipality. In many of these areas the citizen can more readily insure against the loss on an individual basis than can the community as a whole. It would appear that it is much easier for the property owner to procure fire insurance on an individual basis than for a municipality to insure against the failure of its fire department.

■■ It has been held in other jurisdictions that a municipality shall be liable in those situations where a private person would be liable.[4] Also, the tenor of our preceding opinions indicates a similar result. Both Haney and Chapman arose out of situations closely analogous to ordinary tort actions. In Haney the city was maintaining property as a private person would do, and in Chapman the city was driving a motor vehicle. A different situation arises when a claimant seeks to hold the city liable for a risk which is inherently part of the carrying on of the function of government, such as its failure to provide fire protection, police protection or, as here, flood protection. We refer only to the ultimate failure and not to the situation where the city is engaging in activities with the citizen on a person to person basis as any other private citizen might do. Where the act affects all members of the general public alike, it would be unreasonable to apply to it the broad principles of tort liability for the reasons previously stated in this opinion. But, when the city, by its dealings or activities, seeks out or separates the individual from the general public and deals with him on an individual basis, as any other person might do, it then should be subjected to the same rules of tort liability as are generally applied between individuals. This, likewise, is true when the negligent act of the city per chance falls upon the isolated citizen as distinguished from the general public. When that act does not involve the ultimate function of government, the city should be required to respond in damages. This is true without regard to whether the function would have been classified as proprietary or governmental under our old classifications.

■ The maintenance of flood control facilities is a function in which a city is not legally required to engage, yet it is so beneficial to the entire citizenry that nothing should be allowed to hamper or interfere with it. The losses here, as a result of the failure to place the flood gate, could impose a "crushing burden" upon the city, and can properly be classified as a failure in the ultimate function of government, viz., failure to provide flood protection. The effects of the failure were felt by a broad segment of the public alike. And, as the city did not single out or deal with the appellee

4. Steitz v. City of Beacon, 295 N.Y. 51, 64 N.E.2d 704, so held in interpreting a New York statute that provides liability must be "Determined in accordance with the same rules of law as applied to actions in the supreme court against individuals or corporations." Also see the Federal Tort Claims Act, 28 U.S.C. § 2674 (1952) which provides "The United States shall be liable, respecting the provisions of this title relating to tort claims in the same manner and to the same extent as a private individual under like circumstances * * *."

herein on an individual basis,[5] nor was its loss in any way isolated from the loss occasioned by the general public, we are of the opinion that the judgment should be reversed.

The judgment is reversed.

All concur.

5. The proof shows appellee called the city officials by phone and was assured the gates would be put in place. However, we assume many other members of the public received the same assurances. Therefore, this alone was not sufficient to bring the acts of the city into the realm of personal dealing or place the transaction upon an individual basis.