CITY OF LOUISVILLE, Appellant,

v.

Sam HABEEB and Catherine Habeeb
et al., Appellees.

Supreme Court of Kentucky.

June 10, 1977.

Rehearing Denied Nov. 18, 1977.

Joseph H. Eckert, Asst. Director of Law, Carson Porter, Louisville, for appellant.

Malcolm Y. Marshall, Wesley P. Adams, Jr., Stephen F. Schuster, Louisville, for appellees.

JONES, Justice.

This litigation arises out of riots and tumultuous disturbances which occurred in Louisville in the latter part of May, 1968.

The Habeebs, Handmaker and Schneider filed an action in the circuit court. The complaint alleged that on or about May 27, and continuing through May 30, 1968, the property of the Habeebs, Handmaker and Schneider was damaged and/or taken away by a riotous and tumultuous assemblage of people. Their action was predicated upon the provisions of KRS 411.100 which provides:

"If, within any city, any church, convent, chapel, dwelling house, house used or designed for the transaction of lawful business, vessel or shipyard, railroad or property of any kind belonging to any street or other railroad company, or any article of personal property is damaged, or if any property is taken away or damaged by any riotous or tumultuous assemblage of people, the full amount of the damage done may be recovered *by the person injured* (emphasis added) by action against the city, if the city authorities themselves, or with the aid of their own citizens, could have prevented the damage. However, no such liability shall be incurred by the city unless the city authorities had notice or good reason to believe that a riot or tumultuous assemblage was about to take place in time to prevent the destruction, either by their own force or by aid of the citizens of the city. No person may maintain an action under this section if he has unlawfully contributed by word or deed toward exciting or inflaming the tumult or riot, or if he failed to do what he reasonably could toward preventing, allaying or suppressing it."

At a pretrial conference, with consent of counsel, the trial court permitted the parties to file stipulation of facts and briefs and ordered the cause to be decided without a jury.

On October 8, 1973, the trial court found for the Habeebs, Handmaker and Schneider. Whereupon, the City of Louisville prosecutes this appeal.

The City of Louisville presents three claims of error in support of reversal of the judgment; namely, (1) the right of recovery by way of subrogation will not lie against it under KRS 411.100; (2) the Habeebs, Handmaker and Schneider failed to present an action for negligence in failing to prevent destruction of property damages by mob

violence; (3) it had insufficient notice to believe that a riot or tumultuous assembly was about to occur.

In order to separate the chaff from the wheat and place the issues in the clear light of day, a recitation of the stipulations by the parties is necessary.

The facts as stipulated and as found by the court from depositions are summarized as follows:

"During the last week of May, 1968, civil disturbances erupted in the City of Louisville. Detailed herein is a chronological reconstruction of the events as they relate to the issues before the Court.

"I. On Friday, May 24, 1968, the Louisville Policy (sic) Department received a copy of a 'flyer' stating that a rally was to be held at 6 P.M. Monday, May 27, 1968, at 28th and Greenwood. Police agencies within the area, the Director of Safety, Kenneth Newman, and the Federal Bureau of Investigation were notified that the rally was scheduled. The speakers, according to the 'flyer' were to be Stokeley Carmichael and James Cortez.

Upon notification of this meeting, plans were made by the Louisville Police Department to have extra patrol cars standing nearby, out of sight, yet available, and to have those officers necessary to direct traffic in the immediate vicinity.

II. On Monday, May 27, the extra patrol cars stationed were standing by and close to 28th and Greenwood, but were not in view. At 6 P.M. on the 27th, Captain John Hampton, was in immediate control of the police force in the area. At about 5 P.M. Chief Hyde had received a phone call indicating that there might be some trouble at 28th and Greenwood. Two police districts were set up for overtime duty. Information channels were then set up. Plainclothes police were positioned in the area.

At about 7 P.M. a crowd estimated at 200 persons was at 28th and Greenwood. This number steadily increased to an estimated 600 or 700. Calls reached Chief Hyde's office at approximately 8:30 P.M. relating to crowds milling, bottles and rocks being thrown, and then the attacking of police that had come into the area to restore order. Captain Hampton, who was in charge of the particular police district, ordered the cars stationed nearby to go into the area. Chief Hyde, through Colonel Hawkins, called the County and State Police, the National Guard, and the Governor. At 8:30 P.M. Mayor Schmied called General Buster, Commander of the Kentucky National Guard. In response to this call, General Buster, in order to initiate troop response and availability, called a practice alert pending action by the Governor. At 9:00 P.M., the Governor ordered the National Guard to Louisville, Kentucky. At 10:20 P.M. General Buster arrived in Louisville. After a command post was established at Brandeis School, located in the area, the General went to the Chief's office for consultation, where he remained during the night. By daylight, 1,200 troops were at Brandeis School or in reserve at the Fairgrounds Armory. In light of developments, the Mayor imposed a curfew covering the hours from 11:00 P.M. to 5:00 A.M.

It was Monday night, May 27, 1968, that Lucky Morris Pawn Shop was first broken into. Forcible entry was gained into the store at its rear door, at a time when the police were in front confronting the crowd there situated. At approximately 8:30 P.M., shortly after the break-in the police discovered the looting; stopped the looters; confiscated materials, and piled the recovered goods on the floor of the store. At 9:00 P.M., Mr. Handmaker and Mr. Schneider, owners of the Lucky Morris Store business, arrived at the store. They remained the night. Police stayed with them in the area.

III. Tuesday, May 28. By 10:00, troops of National Guard were deployed at 28th and Greenwood with police. The National Guard did not have the power to arrest, and their function was to 'back up' the police and provide protection for fire fighters who were called into the area to combat the many fires which had been started. At this time an establishment on or nearby the corner of 28th and Greenwood, Moon Cleaners, was occupied as a command post.

The morning of the 28th, was relatively quiet. By noon on this date, there were 75 to 100 men in a crowd which congregated at 28th and Greenwood. Large groups of persons began roaming different adjacent streets. At approximately 2:00 P.M., a group of ministers and leaders of the black community met with the Mayor relative to withdrawing the National Guard. At about the same time, 2:45 P.M., on the streets in the area, groups increasing in size were being moved by the National Guard into dispersal patterns. The National Guard and Police were beset at many locations. At this time, Farley Printers, an establishment in the west end area, was burned and the National Guard had to move the crowd back—400 troops were at 28th and Greenwood, 300–400 at 28th and Dumesnil. The troops were under attack from crowds. The removal of the National Guard was vetoed since uncontrollable groups were still roving about. On the evening of the 28th, Gatton's Grocery, situated next to Lucky Morris, was looted. By nightfall the groups had been broken up but isolated incidents were occurring, and order had not been restored. The pattern of looting and burning and violence was spreading out and away from its general initial point.

IV. Wednesday, May 29. On Wednesday morning at a meeting in the Chief's office the decision was made to withdraw the National Guard to the nearby Brandeis School, and to leave the police in the area. The National Guard Troops began withdrawal at about 5:00 P.M. At about the same time, an attempt to de-emphasize or 'cool' the area was made by allowing black 'marshals' to enter the area. These 'marshals' were not trained in police work, but rather they were ordinary black lay men.

While the troops were still in the area on Wednesday afternoon, the plaintiffs' store was looted from the rear. Ten to fifteen police were called in to stop the looting. When Farley's Printing was again burned, National Guard units came into the area with the fire equipment dispatched.

At 8:30 P.M., after the guards had been withdrawn, the plaintiffs' store was looted again and burned. Most of the damage of which the plaintiffs complain occurred at this point. Police cars were dispatched to the scene. The National Guard came back into the area until the stores closed. Troops continued to guard fire fighters, but restrained from using full force, as it was believed that such re-action (sic) would have been a catalyst for further renewed uproar. Police were on the scene.

V. By Thursday, May 30, order was restored to the point that no large crowds were roaming the area. Sporadic, diverse incidents occurred throughout the city to which police were dispatched. The City Police, backed up by State and County Police, continued performance of their duties. The black 'marshals' were still on the streets. National Guard units were standing by at Brandeis School for crowd control functions and units were guarding fire fighters, as the function of the National Guard was for crowd control, not arresting. The police were in the area, and the maintaining of troops in masses at Brandeis School continued. Troops continued to protect firemen in a discretionary operating procedure.

On the evening of Thursday, May 30, sporadic incidents occurred. Once again Lucky Morris was burned.

On Friday, May 31, the outbreaks of sporadic incidents gradually declined. Order was restored by June 2, 1968, thus terminating the situation which had lasted from Monday, May 27 until such date."

"As a supplement to the chronological reconstruction several points of policy and procedure dealing with the handling of civic disorder follow below:

A. Prior to May, 1968, certain members of the Louisville Police Department including Police Chief Hyde and Colonel Austin had had riot control and crowd control training. General Butler (sic) his officers and National Guard troops also had prior training in the suppression of civil disorders:

B. Prior to May, 1968, there were meetings with representatives of the Louisville

Police Department, Jefferson County Police, St. Matthews and Shively Police Departments, National Guard, and various service organizations and utility companies to discuss operational plans in the event of civil disorders. The agreed procedural policy which was in existence during the May disturbances was the 'Operational Plan for the Civil Disturbance, Louisville Division of Police.'

C. The coordination of the various police units, the National Guard and the service organizations was centered during the disturbance in the office of Police Chief Hyde.

D. The function of the National Guard was to effect crowd control in support of the City of Louisville Police. As the National Guard does not have the power to arrest they worked in conjunction with members of the police and fire departments.

E. The deployment of troops was a discretionary matter in support of the police.

F. The use of citizens of the community to aid in the restoration of order was an effort based on advice given the Mayor and Police by members of the Black Community and the Human Relations Council. These 'black marshals' were on the street while the National Guard was still deployed in the 28th and Greenwood area on Wednesday."

The Habeebs, Handmaker and Schneider base their cause of action on removal of the National Guardsmen, and the addition of "Black Marshals" constituted failure of the city to comply with the statute. (KRS 411.-100). That argument ignores the fact that city, county, and state police were left in the area where the damage occurred. The city may have erred in its judgment. However, its act was free from negligence. The city officials took the action they reasonably deemed necessary to quell the riots.

Where a city is sought to be held liable, the rationale for denying liability is:

"Where the act affects all members of the general public alike, it would be unreasonable to apply to it the broad principles of tort liability . . ." *City of*

*Louisville v. Louisville Seed Company,* Ky., 433 S.W.2d 638, 643 (1968).

The record reveals that the City of Louisville did not have notice of the imminent danger to the property of the Habeebs, Handmaker and Schneider on May 29, 1968, the date the mob formed and committed damages about which they complain. KRS 411.100. It is true they knew of tumultuous riots by the mob. On May 27, 1968, police discovered the looting. They stopped the looting and confiscated materials and piled the recovered goods on the floor of the Lucky Morris Pawn Shop, after which they kept guard in the area. It is doubtful that the archangel Gabriel and 1,000 of his cohorts standing guard could have prevented the riotous, tumultuous assemblage or could have prevented the pillage of May 29, 1968, when the damages complained of occurred. Certainly, the removal of the National Guard, who had no power of arrest could not have prevented it.

Because this court finds no negligence on the part of the City of Louisville, and that it complied with the provisions of KRS 411.-100, it is unnecessary to discuss other issues raised by the city.

This court is of the opinion that the trial court erred in holding the City of Louisville liable.

The judgment is reversed with directions that the complaint of the Habeebs, Handmaker and Schneider be dismissed.

All concur.