**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 03-2064**

CHRISTOPHER ROCHE; JUANITA ROCHE,

Plaintiffs - Appellants,

versus

LINCOLN PROPERTY COMPANY; SWIB INVESTMENT
COMPANY,

Defendants - Appellees,

and

INVESCO INSTITUTIONAL,

Defendant.

On Remand from the United States Supreme Court.
(S. Ct. No. 04-712)

Argued: May 5, 2004            Decided: April 7, 2006

Before WIDENER and GREGORY, Circuit Judges, and C. Arlen BEAM,
Senior Circuit Judge of the United States Court of Appeals for the
Eighth Circuit, sitting by designation.

Affirmed by unpublished opinion. Judge Gregory wrote the opinion,
in which Judge Widener and Senior Judge Beam joined.

Jerry M. Phillips, PHILLIPS, BECKWITH & HALL, Fairfax, Virginia,
for Appellants. Connie Nora Bertram, VENABLE, L.L.P., Washington,

D.C., for Lincoln Property Company; Richard Alan Dean, TUCKER, ELLIS & WEST, L.L.P., for SWIB Investment Company.

———————

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

GREGORY, Circuit Judge:

The plaintiffs, Christopher and Juanita Roche, citizens of Virginia, commenced this action in state court against Lincoln Property Company ("Lincoln"), a Texas corporation, Invesco Institutional ("Invesco"), a Delaware corporation, and the State of Wisconsin Investment Board ("SWIB").[1] In their complaint, the plaintiffs alleged that they developed serious respiratory ailments and incurred significant property damage as a result of exposure to toxic mold in their apartment, which was owned by SWIB and managed by Lincoln. Accordingly, the plaintiffs sought damages in excess of $10 million under, inter alia, theories of negligence, breach of contract, fraud, implied warranty of habitability, and conversion. The defendants removed this action to federal district court on the basis of diversity of citizenship. Following the district court's entry of summary judgment in favor of the defendants, the plaintiffs filed a motion to remand the case to state court on the grounds that there was not complete diversity of citizenship between the parties. The district court denied the plaintiffs' motion to remand and the plaintiffs appealed.

In May 2004, we reversed the district court's denial of the plaintiffs' motion to remand and instructed the district court to remand the case to state court. Roche v. Lincoln Prop. Co., 373 F.3d 610 (4th Cir. 2004), rev'd, 126 S. Ct. 606 (2005). In so

---

[1]Invesco is no longer a party to this action.

doing, we only reached the first of the plaintiffs' two arguments against diversity of citizenship, that the Texas parent of defendant Lincoln was not the real party in interest and therefore that Lincoln was not truly diverse from the plaintiffs. Specifically, we concluded that because defendant Lincoln had not disproved the existence of a Virginia subsidiary, it had not met its burden of establishing complete diversity from the plaintiffs. The defendants appealed this decision to the Supreme Court. The Supreme Court reversed our decision and remanded, concluding that "[i]t is not incumbent on the named defendants to negate the existence of a potential defendant whose presence in the action would destroy diversity." Roche, 126 S. Ct. at 610.

As noted above, our initial decision to remand was based solely on our conclusion that the plaintiffs and defendant Lincoln were both citizens of Virginia. Thus, we did not address the plaintiffs' alternative argument against diversity, that defendant SWIB is an arm of the State of Wisconsin and therefore not a "citizen of a state" for the purposes of diversity jurisdiction. Accordingly, on remand, we must first address the threshold issue of whether defendant SWIB is an arm of the state or, rather, an independent agency. If we conclude that defendant SWIB is an arm of the state, then SWIB is not a citizen for the purposes of diversity jurisdiction and we must again remand this case to the state court for a lack of complete diversity. However, if SWIB is

4

not an arm of the State of Wisconsin, then complete diversity exists, and we must go on to assess whether the district court erred in granting the defendants' motion in limine and subsequently granting summary judgment to the defendants.

I.

We decline to restate the underlying facts of this dispute, which are adequately stated in the prior opinions in this case. See Roche v. Lincoln Prop. Co., 373 F.3d 610 (4th Cir. 2004), rev'd, 126 S. Ct. 606 (2005). Accordingly, we now turn to the various issues raised by the plaintiffs on appeal.

A.

The plaintiffs first assert that defendant SWIB is not a citizen of the State of Wisconsin under 28 U.S.C. § 1332, and therefore that the district court should have remanded this action for a lack of diversity jurisdiction. "We review questions of subject matter jurisdiction de novo, including those relating to the propriety of removal." Md. Stadium Auth. v. Ellerbe Becket Inc., 407 F.3d 255, 260 (4th Cir. 2005) (internal quotation marks and citation omitted).

Section 1441 of Title 28 provides that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant

5

or the defendants, to the district court of the United States for the district and division embracing the place where the action is pending." 28 U.S.C. § 1441(a). The defendants based removal on 28 U.S.C. § 1332, which provides for subject matter jurisdiction of all cases between citizens of different states, when the amount in controversy exceeds $75,000.

In Moor v. Alameda County, 411 U.S. 693 (1973), the Supreme Court held that states are not "citizens" for purposes of diversity jurisdiction. Id. at 717. Moreover, state entities and political subdivisions are not "citizens" if they are an "arm or alter ego of the State." Id. at 717-18. As we recently recognized in Maryland Stadium Authority, in order for a suit to be between "citizens of different states" under § 1332, "each distinct interest should be represented by persons, all of whom are entitled to sue, or may be sued, in the federal courts." Md. Stadium Auth., 407 F.3d at 260 (internal quotation marks and citation omitted). Thus, if any party to a suit is not a citizen of a state, a federal court does not have jurisdiction under § 1332. Id. This holds true even if all of the other parties are citizens of different states. See id.

In Maryland Stadium Authority, the court recognized that to determine whether a state entity or political subdivision is an arm of the state and therefore not a citizen under § 1332, a court must look "to the standards announced in cases addressing whether governmental entities are entitled to Eleventh Amendment immunity

6

as an arm of the state." Md. Stadium Auth., 407 F.3d at 260-61. In that context, we typically apply the four-factor test adopted by this court in Ram Ditta v. Maryland National Capital Park & Planning Commission, 822 F.2d 456 (4th Cir. 1987). Accordingly, as the court did in Maryland Stadium Authority, we apply the same four-factor test from Ram Ditta to determine whether SWIB is an arm of the State of Wisconsin and therefore not a "citizen" for the purpose of diversity jurisdiction.

The first Ram Ditta factor requires the court to determine whether a judgment against the entity would be paid out of the state's treasury. Ram Ditta, 822 F.2d at 457. Although a finding that a judgment would be paid out of the state's treasury weighs heavily in favor of a conclusion that the entity is an arm of the state, we must go on to assess the three additional factors: (2) the degree of autonomy that the entity enjoys; (3) whether the entity is involved in primarily state or local concerns; and (4) the manner in which state law treats the entity. See id. at 457-58.

Applying the above factors to defendant SWIB, we conclude that this entity is not an arm the State of Wisconsin and therefore is a citizen within the meaning of § 1332. First, as the district court correctly noted, a judgment against SWIB would not affect the Wisconsin treasury. By act of the Wisconsin legislature, SWIB is an "independent agency of the state" whose purpose is to manage

7

money and property for the state, its agencies and trust funds, in addition to local government entities and state and local employees. Wis. Stat. § 25.15(1). Accordingly, SWIB currently manages over forty separate investment funds, including funds consisting of money from various state agencies, funds consisting of money from municipalities, and funds consisting of money from current and retired state employees. The Wisconsin Retirement System--Fixed Income Trust is the specific SWIB fund that owns the apartment complex where the plaintiffs resided. Importantly, the expenses associated with the management of the Fixed Income Trust, including any liabilities resulting therefrom, are assessed solely against the Trust, and not the state treasury. J.A. 1828-29; Bahr v. State of Wis. Inv. Bd., 521 N.W.2d 152, 158 (Wisc. Ct. App. 1994). Therefore a judgment in this case against SWIB would be assessed by SWIB against the Fixed Income Trust, and would not affect the state treasury. Thus, consideration of the first Ram Ditta factor weighs heavily against the plaintiffs' argument that SWIB is an arm of the state.

Turning to the related second and fourth factors, we conclude that SWIB enjoys considerable autonomy from the State of Wisconsin. As noted above, the legislature expressly recognized that SWIB is an "independent agency" of the State, with the responsibility to (1) sue and be sued in its own name; (2) manage its assets; (3) pay its liabilities; (4) promulgate rules and regulations; and (5)

8

formulate its investment policies.  See Wis. Stat. §§ 25.15, 25.17. Thus, consideration of the second and fourth factors also weighs in favor of a finding that SWIB is not an arm of the state.

The evidence is in equipoise with respect to the third factor, whether SWIB is involved in primarily state or local concerns. Although SWIB manages money for various state agencies and thus can be fairly described as having statewide concerns, it is also true that it has many local concerns, as evidenced by its management of municipal property funds and various retirement funds on behalf of individual employees of local governments.  See Wis. Stat. § 25.15(1).

In sum, after fully considering the Ram Ditta factors, we conclude that SWIB is not an arm of the State of Wisconsin and therefore is a citizen within the meaning of 28 U.S.C. § 1332.  The district court, therefore, correctly concluded that it had subject matter jurisdiction to adjudicate this action and properly denied the plaintiffs' post-judgment motion to remand to state court. Accordingly, we must go on to assess the other issues raised by the plaintiffs.

B.

Assuming that the district court's exercise of subject matter jurisdiction was proper, the plaintiffs next argue that the district court abused its discretion in granting the defendants'

9

motion to bar the testimony of their medical expert, Dr. Richard Bernstein. To the extent that Dr. Bernstein's testimony was admissible, the plaintiffs further contend that the district court erred in granting the defendant's motion for summary judgment on the negligence claim.

In his expert report, Dr. Bernstein asserted that based on his review of plaintiffs' medical test results, the relevant medical literature, and the report of the industrial hygienist, the plaintiffs' exposure to toxic mold in their apartment caused their respiratory ailments. Exercising its gatekeeper function under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the district court found Dr. Bernstein's testimony to be unreliable and granted the defendants' motion to exclude it.

Since decisions on the admissibility of expert testimony are committed to the sound discretion of the trial court, we review those decisions for abuse of discretion. United States v. Barnette, 211 F.3d 803, 816 (4th Cir. 2000). We will find an abuse of discretion only where the district court's "conclusion is guided by erroneous legal principles, or rests upon a clearly erroneous factual finding," or if, after considering all of the evidence, the reviewing court possesses a "definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." Westberry v. Gislavid Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999). "Under the

abuse of discretion standard, this Court may not substitute its judgment for that of the district court; rather, we must determine whether the court's exercise of discretion, considering the law and the facts, was arbitrary or capricious." United States v. Mason, 52 F.3d 1286, 1289 (4th Cir. 1995).

The district court thoroughly analyzed the facts and legal principles respecting Dr. Bernstein's proffered testimony in a well-reasoned thirty-five page opinion. As such, we are unable to say that the court's decision to bar Dr. Bernstein from testifying was arbitrary or capricious. As required by Daubert, the district court analyzed the reasoning and methodology underlying Dr. Bernstein's opinion, which was based on differential diagnosis, to determine whether it was reliable.[2] In concluding that it was not, the court relied on the fact that Dr. Bernstein had been unable to determine that the particular types of mold found in the plaintiffs' apartment were the specific cause of their upper

---

[2]As the court recognized in Westberry, differential diagnosis "is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated. A reliable differential diagnosis typically, though not invariably, is performed after physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests, and generally is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely." 178 F.3d at 262 (internal quotation marks and citations omitted).

respiratory ailments. Further, the district court noted that Dr. Bernstein had failed to exclude any of the other non-mold allergens to which the Roches were sensitive. The district court concluded as follows:

> While methodology of differential diagnosis is scientifically valid, in this instance, Dr. Bernstein has failed to faithfully apply the methodology to facts. First, Dr. Bernstein does not rule in Aspergillus, Cladosporium, and Penicillium as to Mr. Roche because he was not allergic to these molds. Second, although Mrs. Roche was allergic to Aspergillus, Cladosporium, and Penicillium, Dr. Bernstein's reliance on the literature addressing general causation is misplaced because the medical literature provides no scientific support for specific causation. Third, Dr. Bernstein did not test the Roches for sensitivity to Stachybotrys, and he dismisses the Stachybotrys test the Roches had previously undergone as inconclusive. Fourth, the literature upon which he relies provides no support for his leap from general causation to specific causation given the specific molds, the specific levels of exposure, and the Roches' medical history. Fifth, he fails properly to rule out other allergens and to provide any opinion, at his deposition, with the requisite degree of medical certainty.

J.A. 1911-12. Upon full and deliberate review of the record on this issue, along with our consideration of the arguments of counsel, we conclude that the district court did not abuse its discretion in prohibiting Dr. Bernstein from testifying.

Without Dr. Bernstein's testimony, the plaintiffs could not establish that the mold in their apartment was the proximate cause of their alleged respiratory ailments. Accordingly, we conclude that the district court properly held that the defendants were

12

entitled to summary judgment on the plaintiffs' claim for personal injuries resulting from the defendants' negligence.[3]

C.

Next, the plaintiffs assert that the district court erred in granting the defendants summary judgment on their implied warranty of habitability claim. In their original complaint, the plaintiffs asserted that the defendants had breached a common law implied warranty of habitability. Concluding that an implied warranty of habitability between a landlord and tenant is not cognizable under Virginia law, the district court initially dismissed this claim under Federal Rule of Civil Procedure 12(b)(6). J.A. 166. Notwithstanding this ruling, the plaintiffs later reasserted a breach of implied warranty claim as part of their Second Amended Complaint. In so doing, the plaintiffs contended that "[t]his common law duty is an implied warranty under Virginia case law . . . ." J.A. 197. The plaintiffs vaguely asserted that this implied warranty of habitability also arose, in part, by virtue of unspecified portions of the Virginia Residential Landlord Tenant Act ("VRLTA"). J.A. 198.

---

[3] The district court also concluded that the defendants were entitled to summary judgment on plaintiffs' claim for damages to their personal property as a result of the defendants' negligence. J.A. 1931-32. Although the plaintiffs do not formally appeal this ruling, we conclude that the district court properly determined that the plaintiffs had failed to offer any evidence that their chattels were actually damaged by mold exposure.

13

In granting the defendants' motion for summary judgment on this claim, the district court reiterated its previous finding that Virginia does not recognize an implied warranty of habitability. Although the district court recognized that the VRLTA provided a cause of action for specific violations of that statute, the court concluded that the plaintiffs had not pleaded a separate cause of action under the VRLTA. See J.A. 1935-36.

As the district court correctly noted, Virginia does not recognize an implied warranty of habitability between a landlord and a tenant. Hutton v. Burke & Herbert Bank & Trust Co., 46 Va. Cir. 146, 147 (Va. Cir. Ct. 1998) (citing Powell v. John E. Hughes Orphanage, 354, 138 S.E. 637, 644 (Va. 1927)). On appeal from the district court's judgment, the plaintiffs now attempt to recharacterize their implied warranty of habitability claim as an express warranty claim under the VRLTA. A careful review of the plaintiffs' Second Amended Complaint demonstrates that the plaintiffs never raised a separate claim for a violation of the VRLTA.[4] Instead, the plaintiffs passingly referenced the VRLTA as an alternative legal basis for their implied warranty claim, while reiterating that their implied warranty claim arose by virtue of

---

[4]Section VRLTA provides that "[a]ny person adversely affected by an act or omission prohibited under this chapter may institute an action for injunction and damages against the person responsible for such an act or omission . . . ." Va. Code Ann. § 55-248.40. The VRLTA mandates that landlords, among other things, comply with applicable building codes and maintain their properties in a safe condition. See id. § 55-248.13.

14

"Virginia case law." J.A. 197. Thus, because the implied warranty of habitability is not cognizable under Virginia law, and because the plaintiffs failed to assert a separate claim under the VRLTA--except for the first time on appeal--we conclude that the district court correctly granted the defendants' motion for summary judgment.

D.

We also affirm the district court's grant of summary judgment to the defendants on the plaintiffs' conversion claim. In the Second Amended Complaint, the plaintiffs alleged that defendant Lincoln had converted their personal property by (1) exposing it to toxic mold; (2) dispossessing them of the property and withholding it without their consent; and (3) destroying or losing it. With respect to the second and third theories, the plaintiffs contend that the unlawful conversion arose as a result of Lincoln's involvement in the microbial remediation (mold removal) process.

The facts relating to the remediation are as follows. After the plaintiffs discovered mold in certain areas of their apartment, they retained an environmental testing company to test for the presence of mold. The test results indicated that mold was present. As a result, the testing company recommended that the plaintiffs temporarily vacate the apartment until the mold could be eradicated by microbial remediation. The plaintiffs notified

15

defendant Lincoln of the test results, and Lincoln temporarily relocated the plaintiffs to another apartment unit. Shortly thereafter, Lincoln notified Invesco to inform it of the mold situation and the plaintiffs demands.[5] Subsequently, Invesco retained BARCO Enterprises ("BARCO") to conduct the remediation of the plaintiffs' apartment. By letter, the plaintiffs consented to BARCO's removal of their personal property from the apartment for the purposes of conducting remediation. However, the plaintiffs demanded that any remediation attempt would have to result in the complete eradication of the three toxic microbes that had been found in the apartment.

Approximately one month later, BARCO inventoried, separated, wrapped, and removed all of the items of personal property from the plaintiffs' apartment. After this process was completed, BARCO sent the plaintiffs a printed inventory of the property in storage. The plaintiffs contend that this inventory was incomplete because it did not list several of the plaintiffs' most valuable possessions, including their money, jewelry, documents, and guns. After a series of communications regarding the goals of the remediation process, Invesco's counsel sent a letter to plaintiffs' counsel informing him that the plaintiffs had not advised BARCO or Invesco concerning the final disposition of their property, which

---

[5]As noted above, Invesco, who manages SWIB's investment in the apartment complex, is no longer a party to this action.

16

was still located at BARCO's storage facility.  In responding to this inquiry, plaintiffs' counsel admonished that "action taken to harm or destroy any of the property would be considered a conversion and an intentional act for which we will seek redress" and demanded that Invesco reimburse the plaintiffs for the value of the "missing" property, which they contend amounts to $160,000.  As of this appeal, the plaintiffs' property remains in storage at BARCO's storage facility.  From all indications, the plaintiffs have made no attempt to claim the property.

The district court granted the defendants' motion for summary judgment on the plaintiff's conversion claim, concluding that (1) BARCO, and not Lincoln, had removed the plaintiffs' property from the apartment; (2) the plaintiffs had consented to the removal by BARCO; (3) the plaintiffs had later abandoned that property; and (4) even if the plaintiffs had not consented to the removal and not abandoned the property, Lincoln could still not be held liable for the intentional tort of a third party (BARCO).  With respect to the plaintiffs' first conversion theory, that Lincoln had converted the property by exposing it to mold, the court correctly found that the plaintiffs had presented no evidence of mold damage.  See J.A. 1937-38.

For the purposes of this appeal, the plaintiffs have abandoned the first theory but persist that "Lincoln's taking dominion of the valuables of the Roche family, never accounting for them or

17

returning them, constituted conversion." Appellant's Br. at 30-33. In asserting this conversion claim against defendant Lincoln, the plaintiffs point to a single unauthenticated page of handwritten notes, which they contend demonstrate that Lincoln was responsible for removing the property during remediation.[6] Accordingly, the plaintiffs argue that Lincoln, and not BARCO, was the "bailee" of their personal property.

The plaintiffs' bailment theory fails because defendant Lincoln never exercised physical control over the plaintiffs' personal property with an intent to exercise that control. See K-B Corp. v. Gallagher, 237 S.E.2d 183, 185 (Va. 1977). Even accepting the page of handwritten notes as true, they do nothing to counteract the overwhelming evidence in the record--including the plaintiffs' own testimony--indicating that BARCO, and not Lincoln, ultimately removed, itemized, and stored the plaintiffs' personal property. J.A. 528-29, 543-47, 688-89, 708-35. Thus, even if Lincoln initially promised to ameliorate the mold problem by removing, cleaning, and storing the property, as the notes suggest, it does not necessarily follow that the property management company undertook that task. Instead, the evidence demonstrates that

---

[6]These handwritten notes, which purportedly were transcribed by an employee of defendant Lincoln after he or she had discussed the situation with the plaintiffs, state that Lincoln is to remove, clean, and store certain items from the plaintiffs' apartment, prepare an itemized list of property, and terminate the plaintiffs' lease. J.A. 918.

BARCO, at Invesco's request, removed the plaintiffs' property to conduct the microbial remediation. Although the plaintiffs might have had a viable conversion claim against this third party for losing (or stealing) several of their valuables, they did not name BARCO as a defendant. Thus, because defendant Lincoln never exercised dominion and control over the plaintiffs' personal property, the district court properly granted summary judgment on the conversion claim.

E.

Finally, the plaintiffs contend that the district court erred in dismissing their claim for punitive damages. In support of this claim, the plaintiffs asserted that defendants Lincoln and SWIB: (1) knew that there were health hazards associated with exposure to toxic molds; and (2) concealed these mold-related health hazards from their tenants. The district court concluded that even if these factual allegations were true, they did not meet the high threshold of egregious conduct necessary for an award of punitive damages under Virginia law. J.A. 173-74.

It is well-settled that a finding of compensatory damages is a prerequisite for an award of punitive liability. Zedd v. Jenkins, 74 S.E.2d 791 (Va. 1953); Newspaper Publ'g Corp. v. Burke, 224 S.E.2d 132 (Va. 1976). In other words, if the defendant cannot be held liable for the underlying wrong, a plaintiff's derivative

19

claim for punitive damages is barred.  As we have affirmed the district court's dismissal of the plaintiffs' negligence claims for a failure of proximate cause, the plaintiffs' claim for punitive damages fails as a matter of law.

## II.

For the foregoing reasons, we affirm the district court's denial of the plaintiffs' motion to remand; the district court's grant of the defendants' motion in limine; and the district court's grant of the defendants' motion for summary judgment.

AFFIRMED