**CANEYVILLE VOLUNTEER FIRE DEPARTMENT, et al., Appellants,**

v.

**GREEN'S MOTORCYCLE SALVAGE, INC., et al., Appellees.**

No. 2007–SC–000517–DG.

Supreme Court of Kentucky.

June 25, 2009.

---

Gregory N. Stivers, Scott Donald Laufenberg, Kerrick, Stivers, Coyle & Van Zant, P.L.C., Bowling Green, KY, Jason B. Bell, Kerrick, Stivers, Coyle & Van Zant, P.L.C., Elizabethtown, KY, for Appellant.

Alton L. Cannon, Leitchfield, KY, for Appellee.

Christopher Gadansky, David Paul Bowles, Landrum & Shouse LLP, Louisville, KY, for Kentucky League of Cities.

Opinion of the Court by Justice SCOTT.

The present appeal comes to this Court by way of discretionary review from an action asserting negligence brought by Appellees, Orville Green, Catherine Green and Green's Motorcycle Salvage, Inc., against Appellants, Caneyville Volunteer

Fire Department (hereinafter CVFD), the City of Caneyville and CVFD Fire Chief, Anthony Clark.

At the outset, we note that the City of Caneyville was entitled to dismissal. CVFD is an agent of the Commonwealth, having been recognized as such by the General Assembly by KRS 75.070 and declared immune from suit in tort. Because fire departments are thus immune from suit in tort, and are agents of the Commonwealth, albeit operating on a local basis, there can be no attendant municipality liability for CVFD's firefighting actions. Therefore, it is not within our authority to impose civil liability on an arm of the government carrying out such a government function. This is also consistent with KRS 95.830(2) in this instance.

Additionally, Chief Clark is immune in his official capacity as Fire Chief of CVFD. In his individual capacity, Chief Clark is entitled to qualified official immunity for his discretionary acts. Accordingly, we reverse the decision of the Court of Appeals to the extent that it conflicts with these holdings and the rationale articulated herein.

## I. INTRODUCTION

Unquestionably, the prudent path between sovereign immunity and jural rights is a formidable legal quagmire to traverse. As a number of my esteemed colleagues on the bench have observed through the years, immunity is an area fraught with complexities which have divided the courts and confounded jurists. However, the complexity in immunity analysis has much to do with the courts' genuine attempt, over time, to eliminate the guesswork from determining when immunity has been properly and constitutionally recognized. Naturally, striking the appropriate balance has been no small task.

At times during this endeavor, proponents and recipients of immunity have bumped against Kentucky's jural rights or open courts doctrine. While the doctrine is not without its critics, it is a deep-rooted aspect of the Commonwealth's legal canon. And, although some would liken it to legal fiction, we are disinclined to reach such a conclusion. Indeed, thirty-nine (39) other states contain similar such provisions in their state constitutions. Jonathan M. Hoffman, *By the Course of Law: The Origins of the Open Courts Clause of State Constitutions*, 74 Or. L.Rev. 1279 (1995). In fact, the doctrine traces its genesis back to the Magna Carta and was espoused by no less venerated a jurist than Sir Edward Coke who, in his historically significant Second Institute, envisioned it as a vehicle to "ensure the integrity of the judicial process by stating that justice was not for sale," and to avoid undue interference with the judiciary in the courts of law by outside forces.[1] *Id.* at 1281, 1317. Over a century after Coke penned his Second Institute, the doctrine rang true with the American Colonies who feared that the British Crown was meddling in the colonial

---

1. "[T]he clause was apparently taken from Sir Edward Coke's restatement of Magna Carta Chapter 40. It was first incorporated into the Delaware Declaration of Rights while the Revolutionary War was still being fought, well before the United States Constitution established the federal judiciary as an independent branch of government. There is little indication that it was the subject of debate when newer states copied it into their own constitutions. A few states, such as Kentucky and Montana, appear to have made certain assumptions about the meaning of the open courts clause when adopting or revising their constitutions, but they are the exception. In most instances, states simply adopted the open courts clause wholesale and without discussion." *Id.* at 1284–1285 (internal notations omitted).

courts. *Id.* at 1288. Thus, the doctrine found its way into early state constitutions.

Nonetheless, we have been called upon, here, to examine the General Assembly's recognition of immunity in this state's fire departments, which inherently dredges up considerations of sovereign immunity and jural rights. Thus, the matter is one of constitutional interpretation and common law application. As such, this Court is bound, as it has oft been in the past, to articulate a plausible and constitutionally sound solution to an immunity problem while respecting the doctrine of jural rights. That this area of the law is complex in undeniable; however, this does not mean, as the minority suggests, that the remedy is to wipe the slate clean with regards to the evolution and history of the common law in this arena.

■■■ As always, the doctrine of *stare decisis* remains an ever-present guidepost in our undertaking. *Stare Decisis* compels us to decide every case with deference to precedent. "Thus, it is with anything but a cavalier attitude that we broach the subject of changing the ebb and flow of settled law [and while], we do not feel that the doctrine compels us to unquestioningly follow prior decisions when this Court finds itself otherwise compelled," we recognize that "'*stare decisis* [is] the means by which we ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion.'" *Chestnut v. Commonwealth,* 250 S.W.3d 288, 295 (Ky.2008) (*quoting Vasquez v. Hillery,* 474 U.S. 254, 265–265, 106 S.Ct. 617, 88 L.Ed.2d 598, (1986)).

The open courts provision appears in our constitution, Ky. Const. § 14, which was ratified in 1891, and was linked with §§ 54 and 241 and ascribed the moniker of jural rights doctrine in 1932 in *Ludwig v. Johnson,* 243 Ky. 533, 49 S.W.2d 347 (1932). This is a longstanding common law principle of nearly fourscore years, to which this Court should defer—unless we are strongly compelled otherwise, which we are not.

## II. BACKGROUND

The Greens own a motorcycle salvage business in Grayson County outside the city of Caneyville. Their business caught fire on December 3, 2003, and CVFD responded to the call to extinguish the fire. CVFD is a volunteer fire department which provides fire protection services to Caneyville and the surrounding areas. Despite the fire department's attempt to contain the fire, the business along with much of its inventory was destroyed. Appellees subsequently brought suit alleging that CVFD, its Chief, and thus the City of Caneyville were negligent in failing to timely extinguish the fire and that, as a result of this alleged negligence, they suffered more severe property damage than they otherwise would have if additional measures had been taken to extinguish the fire.[2] Appellees also argued that KRS 75.070 and KRS 95.830(2) were unconstitutional.

KRS 75.070, which purports to provide fire departments and firefighters with immunity from civil liability, states as follows:

(1) A municipal fire department, fire protection district fire department, and volunteer fire department and the personnel of each, answering any fire alarms, performing fire prevention services, or other duly authorized emergency services inside and outside of the

2. Specifically, Appellees assert CVFD and Chief Clark should have recognized the need for further assistance in combating the fire earlier and called for additional help from surrounding fire departments.

corporate limits of its municipality, fire protection district, or area normally served by a volunteer fire department, *shall be considered an agent of the Commonwealth of Kentucky, and acting solely and alone in a governmental capacity,* and such municipality, fire protection district, or area normally served by a volunteer fire department, *shall not be liable in damages for any omission or act of commission or negligence while answering an alarm, performing fire prevention services, or other duly authorized emergency services.*

(2) No municipal fire department, fire protection district fire department or volunteer fire department answering any fire alarms, performing fire prevention services or volunteer fire department services inside the corporate limits of the district shall be liable in damages for any omission or act of commission or negligence while answering or returning from any fire or reported fire, or doing or performing any fire prevention work under and by virtue of this chapter and said fire departments shall be considered agents of the Commonwealth of Kentucky, and acting solely and alone in a governmental capacity.

(emphasis added). KRS 95.830(2) is a companion statute dealing with use of fire apparatus, which purports to mandate that "[t]he city shall not be liable in any manner on account of the use of the apparatus at any point outside of the corporate limits of the city. The apparatus shall be deemed to be employed in the exercise of a governmental function of the city."

The Grayson Circuit Court found KRS 75.070 constitutional and dismissed the case with prejudice. On appeal, however, the Court of Appeals reversed the trial court, finding both KRS 75.070 and KRS 95.830(2) unconstitutional for reasons that they violated Ky. Const. §§ 14, 54, commonly known as the jural rights or open courts doctrine.[3] In its reasoning, the Court of Appeals found that KRS 75.070's attempt to confer sovereign immunity on fire departments and firefighters was an impermissible extension of immunity by the General Assembly akin to the type previously struck down by our predecessor Court in *Happy v. Erwin,* 330 S.W.2d 412 (Ky.1959) and *Haney v. City of Lexington,* 386 S.W.2d 738 (Ky.1964). The Court of Appeals held KRS 95.830(2) was unconstitutional because *Haney* had previously determined cities could only enjoy immunity for real or quasi-legislative or judicial functions.

As to the Fire Chief, the Court of Appeals found he was entitled to qualified official immunity, but the record was insufficient to determine whether his acts were discretionary or ministerial in nature, and thus remanded the matter back to the trial court for further proceedings. This Court granted discretionary review.

The impetus of the foregoing is that once again this Court is faced with the prospect of defining the permissible boundaries of sovereign immunity within

---

**3.** In addition to sections 14 and 54, the jural rights doctrine also encompasses section 241 of the Kentucky Constitution. Section 14 provides, "[a]ll courts shall be open, and every person for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay." Ky. Const. § 14. Section 54 states, "[t]he General Assembly shall have no power to limit the amount to be recovered for injuries resulting in death, or for injuries to person or property." Ky. Const. § 54. And, section 241 mandates, in part, "[w]henever the death of a person shall result from an injury inflicted by negligence or wrongful act, then, in every such case, damages may be recovered for such death, from the corporations and persons so causing the same." Ky. Const. § 241.

this Commonwealth and the lengths to which such immunity may extend without improperly impinging upon the citizenry's constitutional right to have access to its courts and to obtain redress therein. Specifically, the task before this Court is to determine whether the Caneyville Volunteer Fire Department is, or should be, afforded governmental immunity from tort liability either by virtue of its status as a governmental or quasi-governmental agency, or pursuant to KRS 75.070, which attempts to confer such immunity, and whether that statute is constitutional.

## III. ANALYSIS

### The Interplay of Sovereign Immunity and Jural Rights

The present matter requires this Court to examine an apparent tension between two doctrines implied in the Kentucky Constitution: sovereign immunity and jural rights. The issue is whether the General Assembly has the right, through the enactment of legislation, to confer immunity on fire departments and volunteer fire departments, or whether jural rights preclude this grant of immunity as unconstitutional.

Firefighting has always been inherently intertwined with American civil governance. Dating back to the establishment of Jamestown in 1607, which was subsequently ravaged by fire a year later, the threat of fire and the need to curtail that threat became a pressing concern for the fledgling American colonies. Firefighting in Colonial America, http://www.firefighter central.com/history/firefighting_in_colonial_america.htm. As early as 1648, the Governor of New Amsterdam, in what is present-day New York, appointed four fire wardens to enforce fire safety rules. *Id.* Volunteer firefighting can likewise trace its roots to colonial America as the vast majority of these early organizations were staffed by volunteer citizen-firefighters. During this same period in New Amsterdam, city burghers appointed citizens to a "Rattle Watch," who volunteered to patrol the city streets at night to alert citizens if they saw a fire and organize a bucket brigade to extinguish it. *Id.* Boston, too, took steps to secure itself from the danger of fire as early as 1631 and already had a remedial fire engine when the city was consumed by fire in 1676. *Id.* When the engine proved ineffective for thwarting the fire, the city subsequently purchased a state of the art machine from England whose tank was filled by bucket brigade. *Id.* This engine brought about the need for the first organized fire department in the colonies, beginning service on January 27, 1678, requiring the General Court to seek out twelve men and a captain to man the engine and fight fires. *Id.*

As with so many things in the emerging Union, Benjamin Franklin played a pivotal role in the development of the modern-day volunteer fire department.[4] Upon a visit to Boston, Franklin observed that the city had a far better established infrastructure for fighting fire than did his hometown of Philadelphia. *See* The Electric Ben Franklin, Franklin's Philadelphia: A Journey Through Franklin's Philadelphia, http://www.ushistory.org/franklin/philadelphia/fire.htm. In 1735, in an effort to drum up support and raise public awareness about the need for organized firefighting, Franklin wrote to his own newspaper, the *Pennsylvania Gazette*, under the alias of "old citizen" as to the threat of fire:

---

4. Interestingly, George Washington served as a volunteer fireman in Alexandria, Virginia in 1774 and Thomas Jefferson also served on a volunteer brigade. The History of American Firefighting, http://www.infobarrel.com/The_History_of_American_Fire_Fighting.

In the first Place, as an Ounce of Prevention is worth a Pound of Cure, I would advise 'em to take care how they suffer living Coals in a full Shovel, to be carried out of one Room into another, or up or down Stairs, unless in a Warming-pan shut; for Scraps of Fire may fall into Chinks and make no Appearance until Midnight; when your Stairs being in Flames, you may be forced, (as I once was) to leap out of your Windows, and hazard your Necks to avoid being oven-roasted.

*Id.* Soon thereafter, on December 7, 1736, Franklin established the Union Fire Company, which served as the model for volunteer firefighter organization in the rest of the colonies. *Id.* By the time of the Civil War, volunteer fire departments were widespread and were emerging as an entrenched aspect of state and local government.

The evolution of firefighting in Kentucky mirrored that of much of the rest of the colonies and, ultimately, the newly formed country. For instance, organized firefighting was first commenced in Winchester in 1792, consisting largely of organized bucket brigades. Winchester Fire/EMS History, http://wfems.winchesterky.com/history.phtml. These remedial tactics soon gave way to engine pumps, filled by buckets and pumped by hand. *Id.* In 1838, in an effort to modernize the firefighting force, the city levied a tax to purchase a modern fire engine dubbed the old "Rough and Ready." *Id.* In 1848, the General Assembly, eager to advance the organization and discipline of the profession, legislated the charter of the Rough and Ready Fire Company, so named after the city's beloved engine, mandating the "duty of each member of said company, when alarms of fire are given, to meet promptly, with their engine, buckets, and other apparatus, the same; and shall, in all cases, render obedience to the officers of said company." *Id.*

Like other cities in the state, modernization in technologies and population increases soon begat more advanced firefighting techniques and closer governmental regulation. Around 1886, Winchester obtained its first horse-drawn steam engine, capable of dispensing with 400 gallons per minute, and by 1909 the fire department had a Webb hose truck, which was apparently one of the first motorized engines in Kentucky. *Id.*

Likewise, the capitol city, Frankfort, has had tax supported fire service since at least the early 1820s and additionally had regulations in effect during that period empowering fire engineers to require the assistance of lay citizens in answering fire alarms and mandating that households own one leather bucket for every three fireplaces found in the home for purposes of fighting house fires. City of Frankfort Fire and EMS, http://frankfort-ky.gov/fire-and-ems.html. In 1895, the Common Council passed an ordinance to establish and maintain a fire company and set forth the manner in which it would be governed. *Id.*

The thrust of the aforementioned historical perspective is to note that the development of fire departments in Kentucky has arisen out of the common need of public service and grown alongside government legislation, regulation, and financial support of these entities. Fire departments, however, are particularly unique in their evolution in that, of necessity, they have been forced to maintain roots confined to the locality in which they serve. Because the nature of firefighting involves the need for expeditious and virtually instantaneous response to the scene of a fire, fire departments are maintained and operated in local areas, despite the fact that the authority from whence their existence arises stems from the central state legislature. *See*

KRS 75.010; *see generally* §§ KRS 95.010–.015

It is incontrovertible that fire departments perform a paradigmatic function of the government in keeping the populous and its property safe from fire. Indeed, one would be hard-pressed to think of a more representative government function. Notably, Kentucky has a longstanding tradition of treating firefighting as a governmental function and thereby cloaking it in immunity. *See Greenwood v. Louisville,* 76 Ky. (13 Bush) 226, *2 (1877) ("although a city has the power to establish a fire department and to appoint and remove its officers, still it is not liable for the negligence of firemen appointed and paid by it."); *Davis v. City of Lebanon,* 108 Ky. 688, 691, 57 S.W. 471, 472 (1900) ("The appellee [city] is authorized by law to establish and provide for the prevention and extinguishment of fire, and it seems that such authority may be treated as a governmental function."); *Terrell v. Louisville Water Co.,* 127 Ky. 77, 80, 105 S.W. 100, 101 (1907) (finding firefighting a government function); *see also City of Louisville v. Bridwell,* 150 Ky. 589, 150 S.W. 672, 673 (1912) ("It is true that in maintaining a fire department for the protection of the lives and property of its inhabitants the city of Louisville performs a public or governmental duty imposed upon it by law, and for that reason it cannot be held liable for injuries resulting."); *Smith v. Lexington,* 307 S.W.2d 568, 569 (Ky.1957) ("This [C]ommonwealth, however, is generally committed to the theory that when a city engages in an activity which relates primarily to the health and welfare of its citizens, it is protected by a sovereign immunity, and we have specifically found that a city fire department is engaged in such work.").

■ The doctrine of sovereign immunity, as embodied in Ky. Const. § 231, purports to prohibit claims against the government treasury absent the consent of the sovereign.[5] Sovereign immunity is a bedrock component of the American governmental ideal, and is a holdover from the earliest days of the Commonwealth, having been brought over from the English common law. The doctrine has been included in all four of the Commonwealth's constitutions and predates each. *Kentucky Center for the Arts Corporation v. Berns,* 801 S.W.2d 327, 329 (Ky.1990).

In recent years this Court has examined the history of sovereign immunity in Kentucky in *Yanero* and in *Berns,* noting that the doctrine made its way into the Commonwealth's jurisprudence at least as early as 1828. *See Yanero,* 65 S.W.3d at 517–518 *citing Divine v. Harvie,* 23 Ky. (7 T.B. Mon) 439 (1828). Thus, by the time our second Constitution was in effect, our courts had recognized that the applicable constitutional provision in force at that time—which manifested authority in the General Assembly to determine the manner in which the Commonwealth could be sued—was but a voluntary grant of ability to sue the state, and that the state was otherwise immune from suit in its own

---

**5.** "As noted in *Reyes v. Hardin Memorial Hospital,* [55 S.W.3d 337 (Ky.2001)] the words 'sovereign immunity' are not found in the Constitution of Kentucky. Rather, sovereign immunity is a common law concept recognized as an inherent attribute of the state. Thus, contrary to assertions sometimes found in our case law, Sections 230 and 231 of our Constitution are not the source of sovereign immunity in Kentucky, but are provisions that permit the General Assembly to waive the Commonwealth's inherent immunity either by direct appropriation of money from the state treasury (Section 230) and/or by specifying where and in what manner the Commonwealth may be sued (Section 231)." *Yanero v. Davis,* 65 S.W.3d 510, 523–524 (Ky.2001) (internal citations omitted).

courts. *See Divine*, 23 Ky. (7 T.B. Mon.) 439 at *2–3.

On the other hand, what has come to be known as the jural rights doctrine exists as the constitutional counterbalance to sovereign immunity. Under Kentucky jurisprudence, three provisions of the Kentucky Constitution have been read in conjunction to assert a canon of jural rights whose purpose is to ensure that citizens are afforded an opportunity to have their causes heard in open court and to prevent the legislature from unnecessarily inhibiting that right. In *Ludwig v. Johnson*, which was the first case to recognize these three sections together as implementing the doctrine, the Court found that the statute under review in that instance

> violates the spirit of our Constitution as well as its letter as found in sections 14, 54, and 241. It was the manifest purpose of the framers of that instrument to preserve and perpetuate the common-law right of a citizen injured by the negligent act of another to sue to recover damages for his injury. The imperative mandate of section 14 is that every person, for an injury done him in his person, shall have remedy by due course of law.

*Ludwig v. Johnson*, 243 Ky. 533, 49 S.W.2d 347, 351 (1932).

*Happy* is typically regarded as extending the reasoning in *Ludwig* and giving rise to the line of cases proffering jural rights as sovereign immunity's counterargument, although nowhere does the case mention sovereign or official immunity. "The line of cases originating from *Happy* provides that the application of official immunity should be limited, that an individual's right to suit should be protected, and that the Kentucky Constitution sections 14, 54, and 241 serve to prohibit the abolition or diminution of legal remedies for personal injuries." G. Thomas Barker, *Of-ficial Immunity in Kentucky: The New Standard under Yanero v. Davis*, 90 Ky. L.J. 635, 646–647 (2002) (internal citations omitted).

In *Happy*, a fire truck operator, responding to a call to fight a fire in a neighboring city, was involved in an accident which injured the appellant-bystander. 330 S.W.2d at 413. Therein, the appellant argued that an earlier version of KRS 95.830(2), which purported to grant absolute immunity to firefighters and municipalities engaged in the use of a fire apparatus outside of the city, was unconstitutional because it prevented the appellant from bringing suit against the alleged firefighter tortfeasor. Our predecessor Court agreed, holding unconstitutional the version of KRS 95.830(2) in effect at the time on the grounds that the statute was an impermissible restraint on a person's right to bring suit for damages done to person or property. *See Happy*, 330 S.W.2d at 414. (finding that the statute ran afoul of Ky. Const. §§ 14, 54).

Accordingly, since the *Happy* decision, this reasoning has typically been asserted by those injured by a government agent for the proposition that sovereign immunity should be limited in scope. *See* G. Thomas Barker, *Official Immunity in Kentucky: The New Standard under Yanero v. Davis*, 90 Ky. L.J. 635, 648 (2002). At first blush, it would appear, then, that the two seminal cases for sovereign immunity and jural rights, *Yanero* and *Happy* respectively, are at odds with one another. Admittedly, these cases and their progeny, espouse two distinct theories based on common law principles. *Yanero* seeks to clarify the sovereign immunity defense to which qualified government agents are entitled under the common law, while "*Happy*, and the jural rights doctrine protect against the overextension of immunity by the legislature."

G. Thomas Barker, *Official Immunity in Kentucky: The New Standard under Yanero v. Davis,* 90 Ky. L.J. 635, 654 (2002) (*citing Happy,* 330 S.W.2d at 412; *Ludwig v. Johnson,* 49 S.W.2d at 351). However, these two lines of cases and competing common law principles need not represent mutually exclusive objectives. Indeed, we believe they may be read together and harmonized to produce compatible ends. Namely, *Yanero* may be construed as providing the proper framework for analyzing liability of a government agent, while *Happy* may be construed to limit the reach of *Yanero* in determining when a statute has extended immunity beyond constitutional constraints. Here, we believe the General Assembly's recognition of firefighters and fire departments' immunity was constitutional and, therefore, not repugnant to jural rights.

### Organizational Framework of Immunity Analysis

In *Yanero,* a junior-varsity high school baseball player, who was not wearing a helmet, was struck in the head and injured by a baseball thrown by a teammate during batting practice. 65 S.W.3d at 517. The batsman ultimately brought suit against the Jefferson County Board of Education, the school's athletic director, assistant coaches, and the Kentucky High School Athletic Association (KHSAA), alleging negligence for failure to require that players wear helmets while participating in batting practice. This Court upheld summary judgment in favor of defendants, the Board of Education, the athletic director and the KHSAA, on grounds of governmental or sovereign immunity and qualified official immunity. *Id.* at 531.

As *Yanero* notes, sovereign immunity "is an inherent attribute of a sovereign state that precludes the maintaining of any suit against the state unless the state has given its consent or otherwise waived its immunity." *Id.* at 517 (*citing* Restatement (Second) of the Law of Torts § 895B(1) (A.L.I. 1979); 72 Am.Jur.2d, *States, Territories, and Dependencies,* § 99 (1974)). Governmental immunity is, thus, a policy-derived offshoot of sovereign immunity and is premised upon protecting government entities from civil liability. *See Yanero,* 65 S.W.3d at 519. The constitutional and policy justifications for the doctrine are rooted in notions of separation of power, the principle being that courts should not be in the position to impose civil liability on government entities engaged in official functions, as this would disrupt the business of the government governing. *See id.;* Ky. Const. §§ 27, 28; *see also Dalehite v. United States.* 346 U.S. 15, 57, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) (Jackson, J., dissenting).

 This Court has long struggled with where the permissible limits of sovereign immunity extend. "The decision when the sovereign immunity defense applies to an entity created by an act of the General Assembly has been historically troublesome to our Court, resulting in diverse decisions difficult to reconcile." *Berns,* 801 S.W.2d at 328. To be sure,

> [t]he only positive conclusion one can draw from the various cases is that the appropriate line separating persons and entities entitled to claim inclusion in the Commonwealth's sovereign immunity is not a line which the General Assembly may draw in its discretion, but a problem of constitutional law which our Court must address on a case by case basis.

*Id.* at 329. The reigning authority on the matter holds that sovereign immunity (as embodied in Ky. Const. § 231) will trump jural rights (Ky. Const. §§ 14, 54, 241) because it is a specific provision of the Constitution, rather than a general provi-

sion. *See id.* However, this only holds true in instances wherein it is the Commonwealth who is being sued. Thus, the crucial determination in sovereign immunity analysis boils down to: whether the entity being sued is the sovereign, its agency, or one who goes about the business of conducting the sovereign's work. Therefore, if CVFD was an agent of the Commonwealth, engaged in the Commonwealth's work, KRS 75.070 is constitutional.

### Determining Agency

Whether an entity is a government agent is a threshold consideration in governmental immunity analysis. However, as *Berns* alludes to, the determination of which entities are to be deemed agents of the state government has, historically, not been a conclusion easily forthcoming and is one which has proven troublesome for our courts in the past, leading to various tests with sometime conflicting results.

One such test for determining whether an entity is an agent of the state is whether, "when viewed as a whole, the entity is carrying out a function integral to state government." *Berns,* 801 S.W.2d at 332; *see also Schwindel v. Meade County,* 113 S.W.3d 159, 168 (Ky.2003). This holistic view of the entity necessarily requires several underlying, subsidiary considerations in making the "integral government function" determination.

In *Berns,* we recognized that *Gnau v. Louisville & Jefferson Co. Metropolitan Sewer Dist.,* 346 S.W.2d 754 (Ky.1961) established a two-pronged test for determining whether an entity was an agent of the state government within the meaning of the waiver provision of the Board of Claims Act, KRS 44.070, with the first

prong "consisting of the direction and control of the central state government/and the second addressing the extent to which the entity was 'supported by monies which are disbursed by authority of the Commissioner of Finance out of the State Treasury.'" *Berns,* 801 S.W.2d at 331. However, this "test" may be more accurately characterized as a factorial analysis, whose showing will lend weight to deciding if an entity should be considered a state agency. *See Yanero,*[6] 65 S.W.3d at 520 ("These [*Berns*] factors are primarily relevant to determining whether an entity is properly classified as a state agency."); *see also Withers v. University of Kentucky,* 939 S.W.2d 340, 342–343 (Ky.1997). The real thrust of the "test" is the third factor that *Berns* adds to the *Gnau* factors, which is whether the entity carries out an integral governmental function.

■ Thus, building off of *Berns* and *Gnau,* in *Autry v. Western Kentucky University,* 219 S.W.3d 713, 717 (Ky.2007), we tried once more to articulate a workable test, stating

> [g]overnmental immunity extends to state agencies that perform governmental functions (i.e., act as an arm of the central state government) and are supported by money from the state treasury. However, unless created to perform a governmental function, a state agency is not entitled to governmental immunity. An analysis of what an agency actually does is required to determine its immunity status.

(internal citations omitted). We believe that *Autry* provides a good reference point for this analysis in recognizing that there must be a subsidiary inquiry into what an entity "actually does" to determine if it

---

**6.** *Yanero,* which is presently the seminal Kentucky immunity case, did not expressly address the issue of how to determine whether

an entity is an agent, instead limiting its focus on distinguishing what properly constitutes governmental versus sovereign immunity.

should be entitled to government immunity. Recognizing the benefit of a factorial analysis,

> The Sixth Circuit has utilized a method of analysis adopted from the Third Circuit for determining whether a governmental entity ... is an "arm of the state" for Eleventh Amendment [sovereign immunity] purposes:

>> [L]ocal law and decisions defining the status and nature of the agency involved in its relation to the sovereign are factors to be considered, but only one of a number that are of significance. Among the other factors, no one of which is conclusive, perhaps the most important is whether, in the event plaintiff prevails, the payment of the judgment will have to be made out of the state treasury; significant here also is whether the agency has the funds or the power to satisfy the judgment. Other relevant factors are whether the agency is performing a governmental or proprietary function; whether it has been separately incorporated; the degree of autonomy over its operations; whether it has the power to sue and be sued and to enter into contracts; whether its property is immune from state taxation, and whether the sovereign has immunized itself from responsibility for the agency's operations.

*Blackburn v. Floyd County Bd. of Educ. By and Through Adams,* 749 F.Supp. 159, 161–162 (E.D.Ky.1990) *quoting Hall v. Medical College of Ohio at Toledo,* 742 F.2d 299, 302 (6th Cir.1984).

At the federal level, jurisdictions are divided as to which factors should be considered in "determine[ing] whether a state agency is an alter ego of the state or is sufficiently independent to constitute a citizen in its own right, [however] courts look to the attributes or characteristics of the agency which tend to associate it with or disassociate it from the sovereign." 32A Am.Jur.2d *Federal Courts* § 748 (2008). Among the factors considered are: (1) whether state statutes and case law tend to characterize the entity as an arm of the state, *PYCA Industries, Inc. v. Harrison County Waste Water Management Dist.,* 81 F.3d 1412 (5th Cir.1996); (2) whether state resources may be required in satisfying adverse judgments against the entity, *State Highway Commission of Wyoming v. Utah Const. Co.,* 278 U.S. 194, 49 S.Ct. 104, 73 L.Ed. 262 (1929); (3) whether the state has a financial or otherwise relevant beneficial interest in litigation affecting the entity, *Martin Sales & Processing, Inc. v. West Virginia Dept. of Energy,* 815 F.Supp. 940 (S.D.W.Va.1993); (4) how the entity is funded, *Pyca Industries, Inc.,* 81 F.3d 1412; (5) its level of autonomy, *id.; Roche v. Lincoln Property Co.,* 175 Fed. Appx. 597, 2006 WL 910241 (4th Cir.2006); (6) whether the entity deals with primarily local or statewide problems, *Roche,* 175 Fed.Appx. 597, 2006 WL 910241; (7) how state law/courts treats the entity, *id.; Texas Dept. of Housing and Community Affairs v. Verex Assur., Inc.,* 68 F.3d 922 (5th Cir.1995) (8) the ability of the entity to sue and be sued in its own name, *e.g., Bosse v. Pitts,* 455 F.Supp.2d 868 (W.D.Wis.2006); (9) whether the entity holds and uses property, *Pyca Industries, Inc.,* 81 F.3d 1412, (10) whether the entity can take or sell property, *e.g., Tradigrain, Inc. v. Mississippi State Port Authority,* 701 F.2d 1131 (5th Cir.1983); (11) the independent management authority of the entity, *Verex Assur., Inc.,* 68 F.3d 922, (12) whether the entity performs governmental or proprietary functions, *Ohio Bldg. Authority v. Xerox Corp.,* 819 F.Supp. 696 (S.D. Ohio 1993); *Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd. 990C80656 v. Amoco Oil Co.,* 883 F.Supp. 403 (N.D.Iowa 1995); (13) the en-

tity's corporate status, *e.g., University System of New Hampshire v. U.S. Gypsum Co.*, 756 F.Supp. 640 (D.N.H.1991); and (14) whether the entity's property is subject to state taxation, *New England Multi–Unit Housing Laundry Ass'n v. Rhode Island Housing and Mortg. Finance Corp.*, 893 F.Supp. 1180 (D.R.I. 1995).

While this list is not exhaustive, it does characterize some of the pertinent considerations federal courts have relied upon in their classification. And, while federal courts are far from uniform in their treatment of these factors, with some indicating that no single factor should be afforded more weight, those that do place more emphasis on a single factor tend to look toward the financial nexus between the entity and the state treasury and/or whether the entity performs an essential governmental function. *See* 32A Am. Jur.2d *Federal Courts* § 748.

It appears from our case law that, although the courts have engaged in somewhat of a hodgepodge of factorial considerations, Kentucky follows the latter approach in placing greater weight on the extent to which the entity engages in an essential government function. *See, e.g., Berns,* 801 S.W.2d at 332 ("when viewed as a whole, the entity is carrying out a function integral to state government."); *Schwindel,* 113 S.W.3d at 168; *Autry,* 219 S.W.3d at 717 ("unless created to perform a governmental function, a state agency is not entitled to governmental immunity.").

■ While the initial determination of agency, for governmental immunity purposes, has proven troublesome, the subsequent liability inquiry is well-settled. If the entity is "a state agency[, then it] is entitled to immunity from tort liability to the extent that it is performing a governmental, as opposed to a proprietary, func-

tion." *Yanero,* 65 S.W.3d at 519 (*citing* 72 Am.Jur.2d, *States, Territories and Dependencies,* § 104 (1974)). A proprietary function is of the type normally engaged in by businesses or corporations and will likely include an element of conducting an activity for profit. *See Schwindel,* 113 S.W.3d at 168. With regards to the governmental versus proprietary test, "when municipal immunity was curtailed, if not effectively abolished, in *Haney v. City of Lexington,* [386 S.W.2d 738 (Ky.1964)] and (again) in *Gas Service Co., Inc. v. City of London,* [687 S.W.2d 144 (Ky.1985)], many assumed that the governmental/proprietary distinction had been abolished with it." *Yanero,* 65 S.W.3d at 519. This was not so. *Yanero* recognizes that the governmental/proprietary distinction lives on and is still good law, having been utilized by this Court in *Berns,* which held that the government agency in that instance (the Center for the Arts) "was not entitled to immunity because it was not created to discharge any 'governmental function,' and was not 'carrying out a function integral to state government.'" *Yanero,* 65 S.W.3d at 520 (*quoting Berns,* 801 S.W.2d at 330, 332). We have noted that while the government/proprietary test is imperfect, it provides

> a reasonable compromise between allowing state agencies to perform their governmental functions without having to answer for their decisions in the context of tort litigation, and allowing private enterprises to pursue their legitimate business interests without unfair competition from government agencies performing purely proprietary functions without the same costs and risks inherent in commercial enterprise.

*Id.* at 521.

Certainly, fire departments and volunteer fire departments are government agents engaged in governmental, as op-

posed to, proprietary functions. The General Assembly outlines that the procedure and authority for creating fire protection districts and volunteer fire departments is the same as creating taxing districts under KRS 65.182. Chapter 75 of the Kentucky Revised Statutes outlines the formation of volunteer fire departments and fire protection districts within this scheme and KRS 75.040 governs the delegation of authority to operate the fire department.

KRS 75.020 governs the manner in which a fire protection district may annex property or reduce its land holdings. KRS 75.040 empowers a fire protection district to levy taxes. KRS 75.050 authorizes a fire protection district to enter into contracts on its own behalf. Volunteer fire departments are recognized and certified under KRS 75.410 by the Kentucky Commission on Fire Protection Personnel Standards and Education—which is attached to the Department of Housing, Buildings and Construction—under the oversight of the State Fire Marshall. KRS 75.400(1). Significantly, KRS 75.070 characterizes fire departments and volunteer fire departments as "an agent of the Commonwealth" that acts "solely and alone in a governmental capacity." *See also* KRS 95A.010(1) ("This chapter shall apply to the personnel of all fire departments in the state whether paid or unpaid, or both.").

Fire departments of all kinds receive funding from taxes and government backing.[7] They do not sell goods nor conduct their business with an eye toward making a profit. To be sure, the very term "volunteer fire department" attests to their task: that is to provide a gratuitous service to the population whereby volunteer citizens risk life and limb to provide a public service.

Looking to the factors previously employed by this Court and those considered by the federal courts, they weigh overwhelmingly in favor of acknowledging that fire departments and volunteer fire departments are government agents who engage in a governmental (not proprietary) function. *Autry*, 219 S.W.3d at 717. Thus, "these facts compel the conclusion that our constitutional fathers would ... view this activity as qualifying for sovereign immunity." *Berns*, 801 S.W.2d at 331.

### The General Assembly's Recognition of Immunity

The Court of Appeals found KRS 75.070 to be unconstitutional insofar as it purported to impart personal immunity upon firefighters for negligent conduct and because fire departments were not agents of state or county government.[8] We disagree.

Fire departments are agents of the Commonwealth who engage in an essential governmental function in providing for the safety and well-being of its citizens—and because there is likely no more epitomizing symbol of government function—reason dictates they must be considered an agent of the sovereign. As such, they are cloaked in immunity from suit in tort. When an entity is entitled to government immunity, the General Assembly may draft legislation recognizing that immunity. "Where sovereign immunity exists by reason of the constitution, the Gen-

---

7. That they receive some contributions from the citizenry is no different than the tolls which states often charge in building parkways.

8. It would seem only logical that fire departments are an agent of one or the other. Here, the General Assembly was clearly within its constitutional authority to acknowledge the immunity to the Commonwealth's fire departments because these entities are agents of the sovereign who engage locally in necessary government functions.

eral Assembly may extend or limit waiver as it sees fit, but where no constitutionally protected sovereign immunity exists the General Assembly cannot by statute create it." *Berns*, 801 S.W.2d at 329. Thus, as in *Yanero* where we found that the KHSAA, as an agent of the Kentucky Board of Education, was entitled to immunity, so too should the CVFD be afforded immunity as an agent of the Commonwealth of Kentucky. *See Yanero*, 65 S.W.3d at 530.

It is an axiomatic rule of statutory interpretation that when this Court considers the constitutionality of a statute, we must draw all fair and reasonable inferences in favor of upholding the validity of the statute. *See, e.g., Posey v. Commonwealth*, 185 S.W.3d 170, 175 (Ky.2006). In Kentucky, a statute carries with it the presumption of constitutionality; therefore, when we consider it, "we are '*obligated* to give it, if possible, an interpretation which upholds its constitutional validity.'" *Commonwealth v. Halsell*, 934 S.W.2d 552, 554 (Ky.1996) (*quoting American Trucking Ass'n v. Com., Transp. Cab.*, 676 S.W.2d 785, 789 (Ky.1984)) (emphasis added). To the extent that there is reasonable doubt as to a statute's constitutionality, all presumptions will be in favor of upholding the statute, deferring to the "voice of the people as expressed through the legislative department of government." *Walters v. Bindner*, 435 S.W.2d 464, 467 (Ky.1968). A constitutional infringement must be "clear, complete and unmistakable" in order to render the statute unconstitutional. *Kentucky Industrial Utility Customers, Inc. v. Kentucky Utilities Company*, 983 S.W.2d 493, 499 (Ky.1998).

In its Opinion below, the Court of Appeals cited to *Haney* and *Happy* for the proposition that KRS 75.070's extension of immunity to municipal fire departments was unconstitutional. *Haney*, however, is inapplicable because KRS 75.070 is not premised on a grant of municipal immunity. Nor does it offend *Happy* as it does not attempt to grant *absolute* immunity, but rather recognizes and extends waiver of immunity for acts carried out only in a government capacity.

Moreover, considering the present statute, the General Assembly has articulated a clear public policy determination—as manifested by the passage of such legislation—that it intends for all fire departments, volunteer fire departments, and firefighters to be immune from tort liability for their governmental or official acts. We would be remiss to ignore a directive which is so clearly within the purview of this Commonwealth's legislature.

In *City of Louisville v. Louisville Seed Co.*, 433 S.W.2d 638, 640–641 (Ky.1968) (*overruled by Gas Service Co., Inc. v. City of London*, 687 S.W.2d 144), wherein the constitutional efficacy of the *Haney* decision was challenged, this Court attempted to come to terms with how to deal with the liability of important public service providers such as fire and police departments in a post-municipal immunity judicial landscape. Therein, we noted:

> Public agencies engage in activities of a scope and variety far beyond that of any private business. These activities affect a much larger segment of the public than do the activities of private business. Private business carries on no activities even remotely comparable to a city street system which may cover many thousands of miles and is used by the entire public. With rare exceptions, private business carries on no function as hazardous or exacting in detail *as the work of a city fire or police department* These activities are so inherently dangerous that private business would hesitate to undertake them ... [but] are so important to the health, safety and welfare of the public that they cannot prop-

erly be abandoned. *And, it can be readily appreciated that the imposition of broad standards of tort liability upon them might be extremely burdensome and could possibly force their curtailment or even abandonment to the detriment of the general public.* For this reason, some reasonable compromise must be reached-one that will permit the isolated citizen to recover for grievous injustices imposed upon him by a negligent society, yet protect that society from what could cumulate into ruinous claims.

*Louisville Seed Co.*, 433 S.W.2d at 641 (emphasis added) (*overruled by Gas Service Co., Inc.*, 687 S.W.2d 144). Consequently, the Court attempted to fashion a rule, which was, incidentally, a mutation of the government/proprietary test, whereby a city would not be liable in tort for risks undertaken by agencies such as fire and police departments on the grounds that they served all members of the public generally as opposed to dealing with persons on an individual capacity. *Id.*

As previously noted, we recognize *Louisville Seed Co.* was subsequently overruled by *Gas Service Co.* and the government/proprietary test is still the prevailing rule; however, it is significant to note the motivation and reasoning behind the formulation of such a rule represent sound judicial policy and we must acknowledge that our courts have been consistently aware of and alarmed by the need to distinguish amongst those agencies which require insulation from liability in order to ensure their continued survival. While policy determinations are generally beyond the purview of the judiciary, they are squarely within the legislative province. Thus, in response to the concerns of the courts and the public, the General Assembly enacted KRS 75.070.

■ Shaping public policy is the exclusive domain of the General Assembly. We

have held that "[t]he establishment of public policy is granted to the legislature alone. It is beyond the power of a court to vitiate an act of the legislature on the grounds that public policy promulgated therein is contrary to what the court considers to be in the public interest." *Commonwealth ex rel. Cowan v. Wilkinson*, 828 S.W.2d 610, 614 (Ky.1992). Through its enactment of KRS 75.070, the General Assembly has articulated the public policy that firefighters and fire departments within the Commonwealth should not be liable for negligent acts committed in good faith in emergency situations while engaged in fighting a fire or responding to a call.

■ Stated otherwise, the statute in question confers governmental immunity to fire departments and qualified official immunity to firefighters engaged in discretionary functions. Thus, the statute fully comports with constitutional law. Unless the General Assembly is prohibited by the Kentucky or Federal Constitutions from enacting such legislation, it must be free to do so. *See Boone County v. Town of Verona*, 190 Ky. 430, 432, 227 S.W. 804, 805 (1921). Here, it is not so prohibited. And, as noted in *Berns*, in the present matter, independent constitutional justification for immunity exists, as KRS 75.070 does not conflict with Ky. Const § 231. *See Berns*, 801 S.W.2d at 329.

Accordingly, we hold KRS 75.070 is constitutional and confers governmental immunity upon municipal fire departments, fire protection district fire departments and volunteer fire departments. CVFD is therefore entitled to governmental immunity.

### Official and Qualified Official Immunity

In its opinion below, the Court of Appeals found KRS 75.070 unconstitutional

insofar as it attempted to confer immunity to Fire Chief Clark in his personal capacity. However, the Court of Appeals determined that Chief Clark and similarly situated firefighters were entitled to qualified official immunity to the extent that they were engaged in discretionary rather than ministerial duties. *Cf. Ashby v. City of Louisville,* 841 S.W.2d 184, 189 (Ky.App. 1992) (holding that municipal policemen were entitled to qualified official immunity as set forth in Restatement (Second) of Torts § 895D(3)). Believing that the record, however, was insufficient to determine whether the negligent action of which Chief Clark was accused was premised upon discretionary or ministerial functions, the Court of Appeals remanded the matter back to the circuit court for further proceedings.

■ We agree with the Court of Appeals' logic to the extent that KRS 75.070 should not be construed to issue a blanket grant of immunity upon firefighters in their personal capacity. "In Kentucky, personal liability for a public officer's or employee's negligent performance of duties depends in part on whether the powers or duties in question were ministerial or discretionary in nature." *Ashby,* 841 S.W.2d at 188 (*citing Thompson v. Huecker,* 559 S.W.2d 488 (Ky.App.1977)).

We simply do not believe that the language of KRS 75.070(1) attempts to confer personal immunity as it expressly references "acting solely and alone in a *governmental* capacity." (emphasis added). Thus, the immediately following reference to "*such* municipality ... district or area" is a clear reference and limitation to its acting in a "government[al] capacity." *Id.* (emphasis added). Indeed, this is an entirely reasonable reading of the language contained therein. *See id.* ("[Firefighters and fire departments shall be considered agents of the Commonwealth] *acting solely*

*and alone in a governmental capacity,* and such municipality, fire protection district, or area normally served by a volunteer fire department, shall not be liable in damages for any omission or act of commission or negligence *while answering an alarm, performing fire prevention services, or other duly authorized emergency services.*") (emphasis added); *see also* 57 Am.Jur.2d *Municipal, County, School, and State Tort Liability* § 454 (2008) (recognizing that in jurisdictions which predicate tort liability on distinguishing between discretionary and ministerial functions, a fire department's decision on how to fight a fire does not give rise to liability.).

■ Moreover, "if there are two ways to reasonably construe a statute, one upholding the validity and the other rendering it unconstitutional, we 'must adopt the construction which sustains the constitutionality of the statute.'" *Flynt v. Commonwealth,* 105 S.W.3d 415, 423 (Ky.2003) (*quoting Halsell,* 934 S.W.2d at 555). Thus, we are bound to construe KRS 75.070 as acknowledging the governmental immunity of fire departments and the official and qualified official immunity of firefighters.

*Autry,* 219 S.W.3d at 717, succinctly and accurately sets forth the current status of Kentucky law in regards to official and qualified official immunity:

> The immunity that an agency enjoys is extended to the official acts of its officers and employees. However, when such officers or employees are sued for negligent acts in their individual capacities, they have qualified official immunity.
>
> Qualified official immunity applies to public officers or employees if their actions are discretionary (i.e., involving personal deliberation, decisions and judgment) and are made in good faith

and within the scope of their authority or employment. This is intended to protect governmental officers or employees from liability for good faith judgment calls in a legally uncertain environment. An act is not "discretionary" merely because some judgment is used in deciding on the means or method used. However, even if an act is discretionary, there is no immunity if it violates constitutional, statutory, or other clearly established rights, or if it is done willfully or maliciously with intent to harm, or if it is committed with a corrupt motive or in bad faith. The burden is on the plaintiff to show that the public official or employee was not acting in good faith.

If the negligent acts of public officers or employees are ministerial, there is no immunity. An act is ministerial if the duty is absolute, certain, and imperative, involving mere execution of a specific act based on fixed and designated facts. If ministerial acts are proper, then the public officer or employee has official immunity without qualification. Any act done by a public officer or employee who knows or should have known that his actions, even though official in nature, would violate constitutional rights or who maliciously intends to cause injury, has no immunity.

(internal citations omitted).

 Therefore, as *Autry* portends, KRS 75.070 recognizes the official immunity enjoyed by firefighters engaged in their official acts; it should not, however, be construed to confer immunity upon firefighters sued in their personal capacity, as such liability turns on a subsidiary qualified official immunity analysis.[9] *See Autry*, 219 S.W.3d at 717.

Here, the CVFD was an agent of the state both by virtue of its engaging in a function essential to government, *Berns*, 801 S.W.2d at 332, (which was inherently governmental as opposed to proprietary in nature, *Yanero*, 65 S.W.3d at 519) and by virtue of the General Assembly's recognition of its historical authority as such. *See* KRS 75.070 ("[a] volunteer fire department and the personnel of each ... shall be considered an agent of the Commonwealth of Kentucky, and acting solely and

9. "The distinction between discretionary and ministerial acts by a government employee is directly correlated to what immunity he will enjoy in the event he has been negligent in his actions or in failing to act. In addition to examining the applicable definitions of 'discretionary' and 'ministerial' acts or functions in determining whether an officer's or employee's act or function is immune, other factors are considered by the courts. In this regard, it has been stated that the determination as to whether an official has acted in his or her discretion or capacity, and therefore is entitled to immunity, is not subject to a fixed, invariable rule, but instead requires a discerning inquiry into whether the contributions of immunity to effective government in the particular context outweigh the perhaps recurring harm to individual citizens. Furthermore, the view has been expressed that, in the final analysis, the decision as to whether a public official's acts are discretionary or ministerial must be determined by the facts of each particular case after weighing such factors as the nature of the official's duties, the extent to which the acts involve policymaking or the exercise of professional expertise and judgment, and the likely consequences of withholding immunity. In addition, noting that the distinction between ministerial and discretionary acts is often made, but has not proved entirely satisfactory, it has been said that the important point is that certain types of activity, such as driving cars, posting warning signs, or moving office furniture are the types of activity for which immunity serves no worthwhile purpose, while other types of activities, such as evaluating reports or employees' performances or deciding upon parole release, warrant at least qualified immunity in order to advance importance public objectives: effective government administered by skilled government officials." 63C Am.Jur.2d *Public Officers and Employees* § 327 (2008) (internal citations omitted).

alone in a governmental capacity."). Therefore, its immunity extends to its officers and employees who are sued in their official capacity. *Autry,* 219 S.W.3d at 717; *see also Yanero,* 65 S.W.3d at 521–522. Thus, in the present instance, to the extent that Chief Clark was sued in his official capacity he enjoys official immunity.

■ Here, the Court of Appeals correctly noted that Chief Clark was named to the suit in both his official and individual capacities. In his official capacity he is immune. However, the Court of Appeals also believed that the record below was insufficient insofar as it failed to articulate precisely how and for what actions/omissions Clark was allegedly personally negligent. Thus, as previously noted, the court remanded the matter to the trial court for such further determinations.

■ In their pleadings and brief, Appellees allege and argue that Chief Clark was negligent because CVFD lacked sufficient equipment and personnel to combat the fire and Clark did not seek assistance from neighboring fire departments until it was too late. However, it should be noted that a judgment call by a fire chief as to how, with what assistance, and in what manner to extinguish a fire is the very definition of a discretionary act. Moreover, a decision as to how to fight a fire does not necessarily render subsequent determinations ministerial. *See* 57 Am. Jur.2d *Municipal, County, School, and State Tort Liability* § 454; *see also City of Hammond v. Cataldi,* 449 N.E.2d 1184, 1187 (Ind.Ct.App.1983).

■ Kentucky has recognized that part and parcel to the scheme of qualified official immunity is the notion that public officials will not be held liable for " 'bad guesses in gray areas.' " *Rowan County v. Sloas,* 201 S.W.3d 469, 475 (Ky.2006) (*quot-*

*ing Maciariello v. Sumner,* 973 F.2d 295, 298 (4th Cir.1992)). Accordingly, in order to charge liability, a complainant may not merely allege injury, but must point to "a causally related Violation of a constitutional, statutory, or other clearly established right,' " *Sloas,* 201 S.W.3d at 475 (*quoting Yanero,* 65 S.W.3d at 523), or produce some proof that the action was not in "good faith," *Autry,* 219 S.W.3d at 717. There is often a clear distinction between proof of a negligent act and proof of any bad faith which prompted it.

Thus, Chief Clark was not engaged in a ministerial function and Appellants have not brought forth any allegations of bad faith. As such, the trial court was proper in its ruling on Appellees CR 12.02 motion to dismiss this negligence action.

Judicious and timely resolution of immunity claims bears a twofold purpose of particular social importance in ensuring that government agents and officials are not needlessly ensnared in protracted litigation *and* in preventing the incurrence of excessive trial expense by both parties.

> These social costs include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office. Finally, there is the danger that fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties.

*Crawford–El v. Britton,* 523 U.S. 574, 591 n. 12, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) (internal citation omitted).

Therefore, recognizing that Chief Clark's acts were discretionary and that there is no allegation, or suggestion, that his decision was in bad faith, Clark was entitled to qualified official immunity in his individual capacity.

## KRS 95.830(2)

██ Moving now to the constitutionality of KRS 95.830(2), the Court of Appeals recognized that the trial court did not rely upon the statute in rendering its decision, nor was the statute principally addressed on appeal. Yet, it employed the rationale of *Happy* (which struck down an earlier statute bearing the same numeration) in determining that the present version of KRS 95.830(2) was unconstitutional. We disagree for reasons that the statute does not offend jural rights.

The former version of KRS 95.830(2) stated:

Neither the city nor its officers or employees shall be liable in any manner on account of the use of the apparatus at any point outside of the corporate limits of the city. The apparatus shall be deemed to be employed in the exercise of a governmental function of the city.

The present version of KRS 95.830(2) states:

The city shall not be liable in any manner on account of the use of the apparatus at any point outside of the corporate limits of the city. The apparatus shall be deemed to be employed in the exercise of a governmental function of the city.

The primary distinction between the statutes is the grant of immunity to city officers and employees in the former statute, whereas, the present statute limits immunity to the city only.

In *Happy,* the principal justification for rendering the former version of KRS 95.830(2) unconstitutional was that it attempted to confer immunity to city officers and employees in their personal capacity. *See Happy,* 330 S.W.2d at 414. At the time of the decision cities still enjoyed municipal immunity. Thus, as the Court of Appeals correctly noted, municipal firefighters would have been immune to the extent they were sued in their official capacity. Therefore, though *Happy* does not expressly indicate as much, it must be presumed that our predecessor Court was troubled about extending immunity to firefighters in their personal capacity for ministerial actions, i.e. actions that involve merely following through on the orders of others or executing a duty under preexisting facts, and accordingly struck down the statute for that reason. *Cf. Sloas,* 201 S.W.3d at 478; *Yanero* 65 S.W.3d at 522.

However, the Court in *Happy* also premised its finding, in part, on the conclusion that the provision violated jural rights. It does not. Ky. Const. § 54 states, "the General Assembly shall have no power to limit the amount to be recovered for injuries resulting in death, or for injuries to person or property." This section has since come to be interpreted as meaning that the legislature may not take away a cause of action which existed as of the inclusion of this section into Kentucky's constitution, which was ratified in 1891.

In 1877, in *Greenwood,* 76 Ky. (13 Bush) 226 at *2, our courts recognized that a city could not be liable for the negligence of its firefighters. Thus, no cause of action existed against the city for the negligent acts of firefighters at that time. As such, KRS 95.830(2), in its present or former manifestation, does not take away a right to suit enjoyed by the citizenry in 1891 and does not offend Ky. Const. § 54. Thus, to the extent that it says otherwise, *Happy* is incorrect.

Nor does *Haney* compel a different conclusion, as *Haney* departed only from previous common law decisions of this Court. *See Haney,* 386 S.W.2d at 741 ("We must make a choice as to whether the change in such a rule [concerning municipal immunity] should be made by the legislature or by

us. The majority of the court [in *V.T.C. Lines, Inc. v. City of Harlan*, 313 S.W.2d 573, (Ky.1957)] believe[d] that the change addresse[d] itself to legislative discretion and that we must content ourselves only with criticism of the rule *which we have created*. We think we were incorrect in [previously] taking such a position. The very foundation upon which such an attitude is based is not a solid one. We have no reason to believe that the members of the legislature approve all existing common law rules concerning tort actions; in fact, many members of that body, when acting in individual capacities as lawyers, have rather forceably [sic] indicated in briefs and petitions for rehearing that they do not. It seems to us that an equally reasonable assumption is that the legislature might expect the courts themselves to correct an unjust rule *which was judicially created*." (internal quotations omitted)). *Haney* did not attempt to assert any constitutional right of this Court to override the legislature's prerogative, i.e., that of the legislative power. Ky. Const. § 29.

## IV. CONCLUSION

In sum, we hold KRS 75.070 constitutional as a permissible recognition, by the General Assembly, of governmental immunity of fire departments and volunteer fire departments; official immunity to firefighters sued in their representative capacity; and, consequently, qualified official immunity to firefighters sued in their personal capacity but engaged in good faith discretionary functions.

As a matter of observation, it cannot be overlooked that were we to hold otherwise, the very survival of a vital profession, which predates the Commonwealth itself, would be significantly called into question. One must but momentarily pause to consider the substantial ramifications of assessing financial liability on volunteer firefighters and fire departments that fall short in their efforts of lending aid to the public. Truly, it is entirely plausible that many such persons would no longer continue to volunteer their services in this endeavor and that these institutions as a whole would be unable to survive, monetarily, the effects of litigation. Extrapolate this conjecture further and one must but pause to see the very real danger this poses to the public in both actual and financial terms.

Further, we also find KRS 95.830(2) to be constitutional. For these reasons, we hereby reverse the decision of the Court of Appeals and affirm the decision of the Grayson Circuit Court, albeit, in some instances, for different reasons.

All sitting. VENTERS, J., concurs by separate opinion.

MINTON, C.J., concurs in result only by separate opinion, in which CUNNINGHAM and SCHRODER, JJ., join.

ABRAMSON, J., concurs in result only by separate opinion.

NOBLE, J., concurs in result only.

VENTERS, Justice, Concurring:

I concur with Justice Scott's opinion. At the risk of extending an already lengthy series of opinions, I submit that regardless of the immunity issue the Appellee's complaint does not state a claim for which relief may be granted. Its only basis for asserting liability is the claim that Appellants negligently "failed to expeditiously extinguish the fire" at Appellee's business. We are informed by Appellee's counsel at oral argument that the only act or omission of the Caneyville VFD deemed negligent by Appellees was that it lacked sufficient manpower and equipment to defeat the blaze. The same could be said of

any fire department at any fire where property is damaged. There is no allegation that members of the Caneyville VFD caused any injury or damage to Appellee, beyond that damage caused by the fire. A fire department does not insure property owners from fire losses, and it has no duty to a property owner to save his property. The record before us consists of nothing more than the complaint, the motion to dismiss, the trial court's ruling, and the appellate pleadings. No answer was even filed. We should not scrap the jural rights doctrine or undertake a major re-evaluation of governmental immunity on what I perceive is an insufficient claim and an exceedingly sparse record. A fire department is not liable for failing, due to its lack of equipment and manpower, to "expeditiously extinguish the fire."

MINTON, Chief Justice, Concurring in Result Only:

I concur with the majority's conclusion that the CVFD enjoys immunity because it is performing a governmental function and not a proprietary function. *Yanero v. Davis*, 65 S.W.3d 510, 520–21 (Ky.2001). I also agree with the result reached by the majority in which neither Chief Clark nor the City of Caneyville will be liable in this action, but I do not agree with the majority's methodology or reasoning.

Immunity, sovereign and otherwise, has been made into a difficult area of the law, full of rules with subsets. Before delving into the details of this case, I feel compelled to say that we should endeavor to drain this judge-made swamp. Said simply, my view of immunity is this: the Commonwealth enjoys inherent immunity by virtue of its status as a sovereign state. As such, the Commonwealth may choose to lend its immunity to its arms and agents, whether those arms and agents are organizations like the CVFD or individuals like Chief Clark. And I would eliminate, or at least reduce, the arbitrary differentiations that have grown up in this Court around the concept of immunity and its various subsets (*e.g.*, sovereign, official, qualified official, *etc.*) and the various tests that we have formulated in this area over the years (*e.g.*, premising qualified official immunity of a state actor based upon whether the acts in question were ministerial or discretionary in nature).

The Commonwealth, speaking through the General Assembly, is forbidden by Section 2 of our Constitution from acting arbitrarily in lending its immunity (*i.e.*, the Commonwealth may not lend its immunity to non-state actors). But absent some specific constitutional prohibition, I believe the General Assembly is free to declare if, when, or how the Commonwealth lends its immunity to its arms and agents. With those general principles in mind, I turn to the facts of this case.

Under our current precedent, a governmental employee receives qualified official immunity for his or her discretionary acts but receives no immunity for the performance of ministerial acts. *Id.* at 522. So it is possible for the employee of an arm of the Commonwealth to have personal liability for actions taken in the scope of, and in furtherance of, the employee's job performance. Unlike the majority, I believe the General Assembly has the power to grant immunity to state actors in their individual capacity. In fact, I believe the General Assembly did just that in KRS 75.070(1).

KRS 75.070(1) provides, in relevant part, that a "volunteer fire department and [its] ... personnel ..., answering any fire alarms ... shall be considered an agent of the Commonwealth of Kentucky, and acting solely and alone in a governmental capacity, and ... shall not be liable in damages for **any** omission or act of com-

mission or negligence while answering an alarm...." (Emphasis added.) The statute is straightforward and uses language broad enough to demonstrate the General Assembly's intent to provide as much immunity and protection as possible, both to fire departments and to their employees answering fire alarms. But the majority construes the statute to limit immunity to Chief Clark and similarly situated firefighters in their official capacities and holds that the firefighters' individual-capacity liability depends upon whether the acts in question were discretionary or ministerial. The artificial distinction between discretionary and ministerial functions appears nowhere in the wording of KRS 75.070(1). So I believe the majority has judicially amended the statute effectively to provide that fire departments and the personnel of fire departments are not liable in damages for "any omission or act of commission or negligence while answering an alarm *provided that the omission or act of commission or negligence is a discretionary, not ministerial act.*" I refuse to graft such a restriction on an otherwise clear statute. *Beckham v. Board of Education of Jefferson County,* 873 S.W.2d 575, 577 (Ky.1994) ("[We are] not at liberty to add or subtract from legislative enactment or to discover meaning not reasonably ascertainable from language used.").

My reading of KRS 75.070(1) causes me to conclude that the General Assembly intended to grant immunity to fire department employees to the same extent enjoyed by fire departments themselves. So I would hold that Chief Clark enjoys immunity in both his official and individual capacity. And although overruled by *Yanero,* our precedent once followed that precise line of reasoning. *Franklin County, Kentucky v. Malone,* 957 S.W.2d 195, 202 (Ky.1997) ("As long as the police officer acts within the scope of the authority of office, the actions are those of the government and the officer is entitled to the same immunity....").

My conclusion runs contrary to our precedent. More particularly, my conclusion regarding Chief Clark's liability runs headlong into the often-cited jural rights theory, under which Sections 14,[10] 54,[11] and 241[12] of our Kentucky Constitution are jointly interpreted to mean that "any common law right of action existing prior to the adoption of the 1891 Constitution is sacrosanct and cannot be abolished." *Williams v. Wilson,* 972 S.W.2d 260, 272 (Ky.1998) (Cooper, J., dissenting). But I consider the jural rights theory to be a judicially created legal fiction to which we should no longer cling. Rather, as Professor Thomas Lewis convincingly declared, "the formal jural rights doctrine is founded on a misconception of Kentucky's 1891

---

**10.** Section 14 provides that "[a]ll courts shall be open, and every person for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

**11.** Section 54 provides that "[t]he General Assembly shall have no power to limit the amount to be recovered for injuries resulting in death, or for injuries to person or property."

**12.** Section 241 provides that:

Whenever the death of a person shall result from an injury inflicted by negligence or wrongful act, then, in every such case, damages may be recovered for such death, from the corporations and persons so causing the same. Until otherwise provided by law, the action to recover such damages shall in all cases be prosecuted by the personal representative of the deceased person. The General Assembly may provide how the recovery shall go and to whom belong; and until such provision is made, the same shall form part of the personal estate of the deceased person.

[C]onstitution. It should be abandoned." Thomas P. Lewis, *Jural Rights Under Kentucky's Constitution: Realities Grounded in Myth*, 80 Ky.L.J. 953, 985 (1991–92).

The jural rights theory first appeared in Kentucky in 1932. *Ludwig v. Johnson*, 243 Ky. 533, 49 S.W.2d 347 (1932). But the case that has the most direct bearing on the one at hand dates to 1959. That 1959 case involved the potential immunity of an employee of a municipal fire department. *Happy v. Erwin*, 330 S.W.2d 412 (Ky.1959). Although it did not expressly use the term "jural rights," a majority of our predecessor court concluded in *Happy* that the General Assembly lacked the constitutional power to enact a statute that provided that a city employee could not be liable for operating a fire apparatus outside the city limits. *Id.* at 413–14. Specifically, our predecessor court opined that "[c]learly the statute violates sections 14 and 54 of the Kentucky Constitution (and would violate section 241 if death were involved.)" *Id.* at 413. Following the logic in *Happy* would lead to the conclusion reached by the majority in this case—*i.e.*, that the General Assembly could not constitutionally enact a statute that provided that Chief Clark and all similarly situated firefighters are immune in their individual capacities for both discretionary and ministerial acts. But because I place no stock in the jural rights theory, I conclude that *Happy* was erroneously decided and should be overruled.

The Commonwealth enjoys immunity simply by virtue of its existence as a sovereign state; and the General Assembly is the governmental body constitutionally authorized to determine if, when, and how that immunity will be waived. *Yanero*, 65

S.W.3d at 523–24. By specifically stating in KRS 75.070 that firefighters are not liable for "any" acts that occur during the course of their firefighting duties, I conclude that the General Assembly has expressed its intention completely to immunize Chief Clark and all similarly situated firefighters. But the majority in *Happy*, proceeding under the jural rights theory, essentially held that the General Assembly lacked the authority to refuse to waive the immunity of state actors. Actually, the *Happy* court went so far as to hold that the elected representatives of the people of this Commonwealth—the General Assembly—lacked the power to declare, as a matter of public policy, that public servants are immune from suit.

Specifically, the *Happy* court opined as follows: "It is argued that the liability of public servants is a matter of public policy for the legislature to determine. However, the public policy of the legislature cannot supersede the public policy of the people of this Commonwealth expressed in their Constitution." 330 S.W.2d at 414. But as Professor Lewis has convincingly argued, "the formal jural rights doctrine is founded on a misconception of Kentucky's 1891 constitution." Lewis, 80 Ky.L.J. at 985. Although I will not belabor this opinion by recapping the results of his scholarly and convincing research, Professor Lewis traces the history of the adoption of Sections 14, 54, and 241 of the Kentucky Constitution and arrives at the conclusion that the framers of our Constitution did not intend for all tort laws extant in 1891 to be inviolable. In other words, history caused Professor Lewis to declare that the jural rights theory was nonsense, an opinion shared by former Justice William Cooper.[13] Tellingly, we have been cited to

---

13. *See Williams*, 972 S.W.2d at 275 (Cooper, J., dissenting) ("[T]he historical analysis of the origins and purposes of Sections 14, 54

and 241 [of the Kentucky Constitution], as set forth in Professor Lewis's article ... reveals not even an implication that those sections

nothing that disputes Professor Lewis's scholastic research. Why, then, do we cling to a legal theory that has no basis in history or the law? Accordingly, I have concluded that *Happy,* along with all the jural rights cases that preceded and succeed it, are unsupportable.

Referring to Professor Lewis's article, former Justice Cooper memorably opined that jural rights "is nothing more nor less than a judicial usurpation of a traditional legislative prerogative." *Williams,* 972 S.W.2d at 272 (Cooper, J., dissenting). I agree. We should disabuse ourselves of the jural rights theory and return the power to "formulate public policy in the area of tort law" to the General Assembly. *Williams,* 972 S.W.2d at 275 (Cooper, J., dissenting). In short, we should abdicate the public policy crown that "[w]e, like Bonaparte, have placed . . . upon our own head." *Id.* And if we abdicate our self-imposed position of control in this area of tort law, we will recognize that the General Assembly may choose when, if, and how it will waive immunity for state actors. Because there is nothing in the words of KRS 75.070(1) that evidences an intent to waive any immunity for Chief Clark—the opposite, in fact, appears—then the removal of the fallacious jural rights theory leaves no impediment to Chief Clark's enjoying immunity in his individual capacity, regardless of whether the acts in question underlying the Greens' complaint are deemed ministerial or discretionary.

I recognize that abolishing the jural rights theory will logically result in the General Assembly having the discretion to "exempt all public officers and employees from any type of liability." *Happy,* 330 S.W.2d at 414. But the General Assembly had that power all along. We have simply refused to recognize that power, instead preferring to cling to the fictitious jural rights theory.

I also see that recognizing the General Assembly's wide-reaching power in this area creates a potential for abuse and may well result in unwise public policy decisions. But the formulation of public policy, whether wise or unwise, is the sole province of the General Assembly, not the judicial branch. *See Williams,* 972 S.W.2d at 275 (Cooper, J., dissenting).

Application of my conclusions regarding the jural rights theory leads to the inevitable conclusion that under KRS 75.070(1), Chief Clark has immunity for actions performed within the scope of his employment, regardless of whether those actions are ministerial or discretionary. Although I do not agree with its reasoning, I do agree with the majority's ultimate conclusion that Chief Clark is not liable in either his official or individual capacity.

Finally, under my approach, the City of Caneyville's liability would be extinguished because neither the CVFD nor Chief Clark would have any potential liability. The majority also concludes that the City of Caneyville should not be liable. But since my reasoning is different than that of the majority, I will briefly address why I believe the City should not be liable.

Our predecessor court overturned decades of precedent when it declared on public policy grounds that municipalities could no longer enjoy immunity. *Haney v. City of Lexington,* 386 S.W.2d 738 (Ky. 1964). I strongly believe, however, that the General Assembly is the governmental body that should make the public policy decision as to whether municipalities, which are, after all, closely governed by

---

are interrelated or that the framers intended for any or all of them, read separately or together, to transform power over public poli-

cy with respect to tort law from the legislature to the judiciary.").

the General Assembly,[14] should not enjoy the immunity afforded other political subdivisions and agents of the Commonwealth. Our learned former colleague, Justice Donald Wintersheimer, said it well when he opined that "[m]unicipal immunity is closely interwoven with sovereign immunity, and to consider them separately is an exercise in inequality[,]" meaning that "[u]ltimately the decision as to whether a municipality should be responsible in tort for the failure to provide proper services or the provision of such services in a negligent fashion is best left to the Kentucky General Assembly...." *Gas Service Co., Inc. v. City of London,* 687 S.W.2d 144, 151 (Ky. 1985) (Wintersheimer, J., concurring). Therefore, I would overrule *Haney,* leaving the matter of municipal immunity from tort to the General Assembly.

The General Assembly has expressly stated in KRS 75.070(1) that a municipality "shall not be liable in damages for any omission or act of negligence" occurring while answering a fire alarm. And I believe we must defer to the General Assembly's policy decision that municipalities, such as the City of Caneyville, should not be liable in damages in cases like the one at hand.

For the reasons discussed, I concur with the majority's ultimate result, but respectfully disagree with its reasoning.

CUNNINGHAM and SCHRODER, JJ., join.

ABRAMSON, Justice, Concurring In Result Only:

I respectfully concur in result only.

While Justice Venters correctly notes that the record before us is "exceedingly sparse," the Caneyville Volunteer Fire Department's representation to this Court regarding its legal status has been unchallenged. The CVFD notes that "contrary to the Appellees' assertion that [CVFD] is the agent of the city, volunteer fire districts are created through special taxing districts set up by **the County** under KRS 75.010 and KRS 65.182. Thus, these agencies are more appropriately characterized as agents of the county and protected by sovereign immunity." (emphasis in the original). Indeed, it is fair to say that the City of Caneyville has no legal role in this controversy whatsoever and thus discussions of municipal immunity, jural rights and, indeed, the constitutionality of KRS 95.830 are beyond the scope of the controversy before this Court. In my view, the CVFD is a county-authorized taxing district and whether viewed in that light or through the "agent of the Commonwealth" status accorded it in KRS 75.070 it has sovereign immunity. The majority is correct that Chief Clark in his official capacity is entitled to the same immunity as the CVFD. Discussions of individual capacity claims and the qualified official immunity doctrine, again in my view, are beyond the scope of this controversy because the Appellees did not state any individual capacity claims against Chief Clark. In sum, I believe that the majority is correct that the trial court properly dismissed the case but I disagree with its rationale.

14. Section 156a of the Kentucky Constitution provides that the General Assembly "may provide for the creation ... government, functions, and officers of cities." Under its constitutional authority, the General Assembly has, for example, enacted statutes designating the proceedings necessary to incorporate a city (KRS 81.050) and has classified cites into six classes. Therefore, it is manifest that the General Assembly's legislative fingerprints are all over the creation, classification, duties, and powers of cities.